RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0176p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

L.H., a minor student; G.H.; D.H.,
  *Plaintiffs-Appellees/Cross-Appellants*,

  *v.*

HAMILTON COUNTY DEPARTMENT OF EDUCATION,
  *Defendant-Appellant/Cross-Appellee*.

Nos. 17-5989/18-5086

---

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 1:14-cv-00126—Curtis L. Collier, Chief District Judge.

Argued: July 26, 2018

Decided and Filed: August 20, 2018

Before: GUY, BATCHELDER, and BUSH, Circuit Judges.

---

## COUNSEL

**ARGUED:** D. Scott Bennett, LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC, Chattanooga, Tennessee, for Appellant/Cross-Appellee. Justin S. Gilbert, GILBERT MCWHERTER SCOTT & BOBBITT, PLC, Chattanooga, Tennessee, for Appellees/Cross-Appellants. **ON BRIEF:** D. Scott Bennett, Mary C. DeCamp, LEITNER, WILLIAMS, DOOLEY & NAPOLITAN, PLLC, Chattanooga, Tennessee, for Appellant/Cross-Appellee. Justin S. Gilbert, GILBERT MCWHERTER SCOTT & BOBBITT, PLC, Chattanooga, Tennessee, for Appellees/Cross-Appellants. Roy H. Henley, THRUN LAW FIRM, P.C., East Lansing, Michigan, Francisco M. Negrón, Jr., NATIONAL SCHOOL BOARDS ASSOCIATION, Alexandria, Virginia, Judith A. Gran, REISMAN CAROLLA GRAN LLP, Haddonfield, New Jersey, for Amici Curiae.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.  When a school district decided to move a disabled child from a "mainstreamed" classroom with non-disabled children to a segregated classroom solely for children with disabilities, the child's parents opposed that decision, removed the child to a private school, and sought relief under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*  After years of dispute and litigation, the district court held that the school district's placement of the child in the segregated classroom was more restrictive than necessary and therefore violated the IDEA, but that the parents' alternative private placement did not satisfy the IDEA either, so they were not due reimbursement.  *L.H. v. Hamilton Cty. Dep't of Educ. (L.H. #1)*, No. 1:14-CV-00126, 2016 WL 6581235, at *1 (E.D. Tenn. Nov. 4, 2016).[1]  We AFFIRM the district court's decision that the school district's placement violated the IDEA, but we REVERSE its decision that the parents' alternative private placement did not satisfy the IDEA, so we REMAND for a determination of the appropriate amount of reimbursement and issuance of a judgment consistent with this opinion.

**I.**

L.H. is a 15-year-old boy with Down Syndrome.  He is by all accounts a personable and kind boy and an enthusiastic learner.  In fact, if there is one constant in this record, it is that every witness for either party has been complimentary of and affectionate toward L.H.

From 2009 to 2013, L.H. attended Normal Park Elementary School, a public school operating under the Hamilton County (Tenn.) Department of Education (HCDE).[2]  To

---

[1]The parents had also sought restitution for the private school placement via the Americans with Disabilities Act, 42 U.S.C. § 12132, and Rehabilitation Act, 29 U.S.C. § 794(a), and the district court held that they had proven those claims, though it appears to have awarded no relief.  Because the parents sought only monetary restitution, and because we hold herein that they are entitled to reimbursement under the IDEA, we find that these other claims are now redundant and we therefore pretermit these ADA and RA claims in this appeal.

[2]L.H. attended Normal Park beginning at age six in the 2009 schoolyear, for four years: kindergarten, first grade, a repeat of first grade, and second grade.  In the 2013 schoolyear, HCDE decided to move L.H. for third grade, prompting this dispute.  L.H.'s parents instead moved him to private school, where he completed the next five years: third, fourth, fifth, sixth, and seventh grades.  Presumably, he will enter the eighth grade this fall.

accommodate L.H.'s intellectual disability, a group (the "IEP team"), comprising his parents and several teachers and staff, prepared an annual "individualized education program" (IEP), which is a requisite planning document with goals and objectives based on L.H.'s past and expected performance. Through second grade, the annual IEPs followed the regular Tennessee school curriculum in a regular-education classroom with non-disabled children of the same age or grade (hereinafter "grade-level peers"), though with added special-education supports and services for L.H., such as daily "pull-out time" (one-on-one instruction with a special-education teacher outside the regular classroom), "push-in time" (a special-education teacher in the regular classroom), occupational therapy, speech-language therapy, and a full-time aide.

L.H.'s parents are fully invested in his education and participated in formulating his IEPs. Because they have expectations for L.H. and want him to reach his full potential, they pushed their preferences for his education and regularly sent information regarding Down Syndrome to assist in his educational development. Outside the classroom, they read with L.H., reviewed his homework daily, and did extracurricular activities with him. Moreover, it was their strong and clearly stated desire that L.H. be "mainstreamed," i.e., educated in the standard public-school setting, integrated with non-disabled grade-level peers, and taught the standard curriculum.

During his first three years at Normal Park (kindergarten and two first grades), L.H. made progress academically but did not keep pace with his grade-level peers. By May 2012, he had learned basic math concepts but overall was at a kindergarten level. His independent writing ability was also at or below a kindergarten level. But he was reading at a mid-to-late first-grade level, nearly on par with his grade-level peers, though his comprehension was behind.

When the IEP team met to develop L.H.'s second-grade IEP in May 2012, some HCDE staff suggested moving L.H. to a Comprehensive Development Classroom (CDC), an isolated class comprising solely special-education students and located at a different school. L.H.'s parents opposed that suggestion and insisted that L.H. remain in the regular-education classroom. So L.H. remained at Normal Park with the aid of special-education supports and services.

The 2012-2013 (second grade) IEP's educational goals followed regular second-grade curricular goals, which were a significant step up from the goals contained in L.H.'s 2011-2012

(repeated 1st grade) IEP, both in number and in difficulty. The HCDE teachers and staff later claimed they thought the goals were unrealistic, but all members of the IEP team—including L.H.'s parents and eight HCDE teachers and staff—agreed to the goals and objectives then.

When second grade started and L.H. struggled to meet the goals, his classroom teacher, Stefanie Higgs, and his special-education teacher, Lisa Hope, claimed that he lacked the prerequisite skills. Because both Higgs and Hope were relatively inexperienced, Hope consulted Jeanne Manley—an experienced special-education teacher designated by HCDE for teacher training and support—several times regarding teaching strategies to try with L.H. Despite these efforts, L.H. did not progress as fast or as far as they hoped. These teachers also reported that L.H.'s behavior was becoming disruptive (claiming he would invade his classmates' personal space, disobey teachers' directions, and "shut down" or refuse to work).

Surmising that the behavioral issues were due to L.H.'s frustration with the difficulty of the work, Hope modified his lessons to a kindergarten level (with the exception of reading, which remained at a first-grade level). Higgs and Hope also attempted to minimize distractions by isolating L.H. toward the back of the room, away from tables with containers of distracting work materials and the traffic of the other students. According to Hope, L.H.'s behavior improved noticeably after these changes, particularly the reduction of his work level.

L.H.'s behavior improved but progress toward the second-grade goals in his IEP did not, and Higgs and Hope doubted that he would meet the IEP goals by year end. When they relayed this in L.H.'s second-quarter IEP progress report, L.H.'s parents requested a meeting. At the meeting, HCDE staff stated that L.H. was working far below grade-level expectations. Jill Levine, the Normal Park Principal, told L.H.'s parents that although L.H. had benefitted from the regular-education setting in kindergarten and first grade, he had "hit a wall" and was no longer progressing, and she again suggested the CDC special-education classroom. L.H.'s parents opposed this, specifically objecting to the lack of interaction with non-disabled grade-level peers, the absence of a normal academic curriculum or standards, and separating L.H. from his friends.

During four IEP planning meetings over the next few months, HCDE staff insisted on the CDC placement. L.H.'s parents resisted. They contested HCDE's assessment of L.H.'s

performance, questioned the teachers' qualifications, and relied on evidence of the benefits of mainstreaming and the downsides of segregation in the CDC.  HCDE, in turn, emphasized L.H.'s poor performance, alleged disruptiveness, and the necessity of the CDC placement.

In May 2013, over his parents' objections, the HCDE finalized L.H.'s 2013-2014 (third grade) IEP.  HCDE asserted that L.H. needed more support than it could provide at Normal Park and unilaterally ordered L.H. transferred to the CDC at Red Bank Elementary, a segregated classroom for children with disabilities, with an alternative curriculum, at a different location.

According to L.H.'s parents, this new IEP resulted in a 40% reduction in L.H.'s academic instruction time, from five hours per day to three hours per day.  According to HCDE, however, L.H. would spend 3.5 hours per day (90 minutes of reading, 90 minutes of math, and 30 minutes of pre-vocational instruction) in the segregated classroom with the other special-education students, and spend the rest of the day with non-disabled peers at lunch, music, art, physical education, and 30 minutes of social/emotional special education push-in instruction.  But, even by HCDE's account, some of the proposed instruction appeared questionable.  For example, HCDE's director of Special Education, Margaret Abernathy, testified that L.H. would receive instruction in math and handwriting through his physical education (gym) class and, though conceding that the physical education teacher is not a state accredited math teacher, she insisted that the physical education standards require higher order thinking skills such as math.

The new curriculum was different qualitatively as well as quantitatively.  This new IEP did not tie L.H.'s academic goals to third-grade regular-education standards in any way.  Instead, the Red Bank CDC uses an online special-education software program called the Unique Learning System (ULS) to teach reading and math in the framework of monthly science and social studies units, which can be supplemented as necessary by more focused reading and math lessons.  The ULS program follows Common CORE standards but it is not peer-reviewed, as the IDEA requires, nor is it tied to Tennessee's general-education standards.  It does not provide

standard report cards or track educational progress under state standards. Particularly distressing to L.H.'s parents is that this curriculum does not provide for any homework.[3]

Physically, the Red Bank CDC was small and self-contained, with two teachers and nine students. Despite the attempted integration during lunch and arts classes, experts from both sides agreed that there would be little interaction between disabled and non-disabled students. While in music class or at lunch, CDC students sit and interact almost exclusively with each other. Also, while nearly all of the CDC students were verbal to some degree or another, and most demonstrated an ability to work with fewer adult prompts than L.H. had been requiring, none appeared to be as advanced as L.H. in reading or in their desire or ability to socialize. Thus L.H. would have been particularly isolated in the CDC, but likely unable to comprehend why.

L.H.'s parents rejected the May 2013 IEP and, instead, enrolled L.H. at The Montessori School of Chattanooga (TMS) for the 2013-2014 schoolyear, where he has remained during resolution of this case. TMS is a private school, operating in the Montessori Method, with a curriculum aligned with Common CORE standards and covering language and math, as well as a variety of other subjects, such as botany, zoology, cooking, and history. Classrooms are multi-grade, and students proceed through the curriculum at their own pace. The teacher prepares an individualized lesson plan for each student, and the student picks the order in which to work on the lessons. When the student completes the plan, the teacher prepares a new plan based on the student's progress. L.H.'s classes had 17 or 18 students, a classroom teacher, and a full-time aide to help L.H. with his work and keep him on task. L.H.'s parents paid for the aide, though TMS actually employed her. L.H. got along well with his classmates, none of whom were disabled, and though he had some issues with personal space and behavior when he was overexcited, he was universally considered to be friendly, respectful, and well-behaved. It also bears mention that L.H.'s parents are pleased with L.H.'s progress—academic, social, and behavioral—during his five years at TMS, covering third through seventh grades.

---

[3]The parents' expert, Dr. Whitbread, testified that she had never seen a special-education program that did not assign homework. She explained that homework is a connection between home and school for the parents and the student, and that the absence of homework reflects to all involved that this is not a typical school experience.

According to TMS's testing and progress reports, L.H. made steady progress. HCDE disputed this, however, accusing TMS of misrepresenting the results and arguing that L.H. did not actually progress at TMS. L.H.'s parents and experts contend that much of this is rooted in prejudice on the part of public school employees against the Montessori Method, and it is hard to ignore the partisan motive of HCDE's teachers and staff, who are effectively parties in this case; TMS's teachers and staff have no such motive. But the district court found HCDE's witnesses more credible and sided with HCDE's assessment that, although the TMS teachers and the parents' experts assessed him as having achieved a much higher level, as of L.H.'s third or fourth grade year at TMS, his math skills were at a first-grade level, his ability to decode words was a third-grade level, and his reading comprehension an early-second-grade level.

Meanwhile, L.H.'s parents had filed an IDEA administrative complaint to challenge the IEP. In that proceeding, an ALJ ruled for HCDE, finding that Normal Park was not appropriate for L.H and, therefore, HCDE properly removed him to the Red Bank CDC. L.H.'s parents appealed to the district court, which heard additional evidence and rendered an independent decision, holding that placement at Red Bank CDC was more restrictive than necessary and therefore improper, but that L.H.'s parents' alternative private placement at TMS did not satisfy the IDEA, so they were not entitled to reimbursement. *L.H. #1*, 2016 WL 6581235, at *1.

Both parties appealed.

## II.

The Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, requires states that receive federal funds for education to provide every disabled child who wants it a "free and appropriate public education" (FAPE). 20 U.S.C. § 1412(a)(1)(A); *Endrew F. v. Douglas Cty. Sch. Dist.*, 580 U.S. --, 137 S. Ct. 988, 993 (2017). A FAPE has two requirements that are relevant here: the school must prepare an "individualized education program" (IEP) for the disabled student, § 1414(d)(1)(A); and that IEP must provide the FAPE so as to educate the disabled student in the "least restrictive environment" (LRE) possible, § 1412(a)(1), (5).

The IEP is "the centerpiece of the [IDEA]'s education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). The IEP must state the student's educational

status, the annual goals for the student's education, the special-educational services and aides to be provided to meet those goals, and the extent the student will be "mainstreamed," i.e., spend time in school environments with non-disabled students.  § 1414(d)(1)(A).  A team of people work cooperatively to formulate the IEP.  This "IEP team" comprises the student's parents or guardian, a school district representative, the student's regular and special education teachers, a person able to interpret the student's results and evaluations, and, when appropriate, the student. § 1414(d)(1)(B).  The IEP must (1) comply with the procedures set forth in the IDEA and (2) be "reasonably calculated to enable the [student] to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982).  "[T]he process of providing special education and related services to handicapped children is not guaranteed to produce any particular outcome," *id.*, and, therefore, the IEP's substantive "educational benefits" are best measured under the paradigm of "appropriate progress" based "on the unique circumstances of the child for whom it was created," *Endrew F.*, 137 S. Ct. at 1000-01.

The LRE is a *non-academic* restriction or control on the IEP—separate and different from the measure of substantive educational benefits—that facilitates the IDEA's strong "preference for 'mainstreaming' handicapped children," *Rowley*, 458 U.S. at 181 n.4.  "To the maximum extent appropriate, children with disabilities, . . . [must be] educated with children who are not disabled," and separated "only when the nature or severity of the disability . . . is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  § 1412(a)(5)(A).  This preference is not absolute, however, and a school may separate a disabled student from the regular class under circumstances when: (1) the student would not benefit from regular education; (2) any regular-class benefits would be far outweighed by the benefits of special education; or (3) the student would be a disruptive force in the regular class. *Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir. 1983).

In practice, the IEP and LRE generate two different types of decisions.  Formulating the IEP's substantive educational benefits most often concerns methodology, such as deciding between alternative programs or methods for educating a disabled student—these types of decisions require the school district's educational expertise. *McLaughlin v. Holt Public Schools Bd. of Educ.*, 320 F.3d 663, 673 (6th Cir. 2003).  Establishing the LRE, however, concerns

whether, or the extent to which, a disabled student can be mainstreamed rather than segregated and does not require any such educational expertise. *Roncker*, 700 F.2d at 1062. Simply put, "[i]n some cases, a placement which may be considered better for academic reasons may not be appropriate because of the failure to provide for mainstreaming." *Id.* at 1063. Mainstreaming can be, and often is, a contentious issue between the school and the disabled student's parents.

To ensure that the student's parents or guardian are informed of the decisions affecting their child and given an opportunity to participate in or object to those decisions, the IDEA provides a series of procedural safeguards. § 1415. If ordinary avenues of communication are insufficient, aggrieved parents can begin a formal grievance process by submitting a "complaint" to the school "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." § 1415(b)(6). This triggers a formal meeting among the parents, school officials, and the IEP team. § (f)(1)(B)(i)

The complaint may be categorized as alleging procedural or substantive violations. § 1415(f)(3)(E). Procedural violations generally concern "the preparation of an IEP," *Rowley*, 458 U.S. at 206, such as the evaluation, placement, and IEP-formation procedures outlined in § 1414. Substantive violations concern the substance of the IEP; namely, whether the school has provided "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001.

If the meeting fails to resolve the complaint, the parties may enter voluntary mediation, § 1415(e)(2)(A)(i), with an impartial mediator, § (e)(2)(E), at the school's expense, § (e)(2)(D). If mediation fails, or if the parties choose not to mediate, the aggrieved parents may file a "due process complaint" and have a due-process hearing. § (b)(7)(A), (f). A state administrative law judge ("State ALJ"), acting under the school district's authority, conducts that hearing and renders a decision. Under some circumstances, a party may appeal to a state educational agency for review or another hearing. § (g)(1). That is the last option in the state grievance procedure.

Once the State ALJ issues a decision, however, the IDEA's grievance procedure is exhausted and the parties may sue in federal court. § 1415(i)(2)(A); *Fry v. Napoleon Cmty. Schs.*, 580 U.S. --, 137 S. Ct. 743, 753 (2017). The party challenging the IEP, typically the parents or

guardian, has the burden of proving by a preponderance of the evidence that the IEP devised by the school is inappropriate. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005).

The district court applies a "modified de novo" standard of review, *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 565 (6th Cir. 2000), meaning that it must make an independent decision based on the preponderance of the evidence while also giving "due weight" to the determinations made by the State ALJ, *Rowley*, 458 U.S. at 206. Towards this objective, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." § 1415(i)(2)(B). The court may not "simply adopt the state administrative findings without an independent re-examination of the evidence," *Doe v. Metro. Nashville Pub. Schs.*, 133 F.3d 384, 387 (6th Cir. 1998), but neither may it "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]," *Rowley*, 458 U.S. at 206. As with the deference to school officials on matters of substantive educational methodology, the weight due to the State ALJ's findings depends on whether the finding is based on educational expertise. *McLaughlin*, 320 F.3d at 669. "Less weight is due . . . on matters for which educational expertise is not relevant because a federal court is just as well suited to evaluate the situation[;] [m]ore weight . . . is due to . . . determinations on matters for which educational expertise is relevant." *Id*.

The district court reviews for both procedural and substantive violations. The court must first determine whether the school complied with the IDEA's procedural requirements. *Rowley*, 458 U.S. at 206. This is an inquiry into "the process by which the IEP is produced, rather than [into] the myriad of technical terms that must be included in the written document," *Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990), or into mere technical violations, which do not provide a basis for invalidating an IEP, *Dong v. Bd. of Educ. of Rochester Cmty. Sch.*, 197 F.3d 793, 800 (6th Cir. 1999). An important aspect in assessing procedural compliance is whether there was adequate parental involvement and participation in formulating an IEP. *See Renner v. Bd. of Educ. of Pub. Sch. of City of Ann Arbor*, 185 F.3d 635, 642 (6th Cir. 1999); *see also Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004) ("Participation must be more than a mere form; it must be *meaningful*."). If the procedural requirements are satisfied, the

court grants greater deference to the State ALJ's determinations on the second step, the substantive analysis. *Dong*, 197 F.3d at 800. In the second step, the court must decide whether the IEP's substantive educational plan was "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999 (endorsing and narrowing *Rowley*, 458 U.S. at 206-07); *accord Deal*, 392 F.3d at 862.

While pursuing a challenge to an IEP, the parents may unilaterally remove the student from the public school, "place the child in a private school[,] and seek reimbursement for the cost of the private school," *Sch. Comm. of Town of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369-70 (1985), though they "do so at their own financial risk," *id.* at 373-74. To award reimbursement, the State ALJ or district court must find both that: (1) the public school violated the IDEA and (2) the private school is appropriate under the IDEA. *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993). This means that, even though the IDEA's requirements do not apply to private schools, *id.* at 13-14, for reimbursement purposes, the private school must satisfy the substantive IEP requirement, i.e., it must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 999. But the private school need not meet the full public school standards. 34 C.F.R. § 300.148 ("A parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by [state and local education agencies].") (codifying *Florence Cnty.*); *see also C.B. v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) ("To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.") (quoting with approval *Frank G. v. Bd. of Educ.*, 459 F.3d 356, 365 (2d Cir. 2006)). However, we have also held that a unilateral private placement does not satisfy the IDEA unless it, "at a minimum, provide[s] some element of special education services in which the public school placement was deficient"; for example, specific special-education programs, speech or language therapy courses, or pre-tutoring services. *Berger v. Medina City Sch. Dist.*, 348 F.3d 513, 523 (6th Cir. 2003). Importantly, parents are not "entitled to reimbursement for

private school just because the private placement is less restrictive than the public school placement." *Id.* at 522.

In an appeal from the district court's decision, we review the district court's findings of fact for clear error and its legal conclusions de novo. *Deal*, 392 F.3d at 850.

## III.

HCDE claims that the district court erred by holding that its placement of L.H. at the Red Bank CDC was not the least restrictive environment (LRE). HCDE presses six arguments here. Because this leaves much of the district court's analysis of this issue unchallenged, we pause to endorse that analysis, *see L.H. #1*, 2016 WL 6581235, at *9-23, as thorough, compelling, and correct. We address only the six specific arguments that HCDE has raised in this appeal.

## A.

HCDE argues that the district court used the wrong standard in assessing whether the Red Bank CDC satisfied the LRE requirement, claiming that the district court's version of the *Roncker* standard, of "some" benefit, was overruled by *Deal* and *Endrew F.*, which, HDCE claims, impose a standard of "*meaningful* educational benefit."[4] That is incorrect. *Deal* and *Endrew F.*[5] set a standard for assessing an IEP's substantive educational plan. *Roncker* provides a test for a different question: whether an IEP can overcome the LRE requirement and compel segregation of the student despite the IDEA's strong preference for mainstreaming. One way to do so—i.e., one exception to the LRE requirement—is, according to *Roncker*, 700 F.2d at 1063, to prove that the mainstreamed placement would provide the student *no benefit at all*. The district court framed this in the obverse, showing that the mainstreamed placement would have "some" benefit. That is, because mainstreaming at Normal Park provided L.H. with "some" educational benefit, the *Roncker* "no benefit" exception did not apply and the IEP's segregated

---

[4]HCDE also claims that "[t]he need for academic and functional advancement necessarily drives a student's LRE." HCDE provides no legal citation for this assertion but instead appears to rely on its interpretation of *Endrew F.*, which, if followed to its ultimate conclusion, would remove the LRE requirement entirely. That is not the law, nor is it reasonably inferred from *Endrew F.*, though it is clearly HCDE's desire.

[5]The *Endrew F.* language has been quoted several times herein. It is therefore noteworthy that it does not use *Deal*'s phrase of "meaningful educational benefit," though its language is functionally the same.

placement at Red Bank CDC could not overcome the LRE requirement on that basis. Whether Normal Park would or could provide a "meaningful educational benefit" in its own right (and thus satisfy the substantive requirement for the IEP) is a different question, but not a standalone question given that "a placement which m[ight] be considered better for academic reasons m[ight] not be appropriate because of the failure to provide for mainstreaming." *Id.* As for HCDE's contention that the district court must not have found that Normal Park could have provided L.H. with a *meaningful* educational benefit because the opinion did not use *that exact phrase*, that contention is unsupportable.[6] Although it is true that the district court's opinion did not state *expressly* that Normal Park could provide L.H. with a meaningful educational benefit, the totality of the court's findings clearly compel that conclusion.

**B.**

HCDE next argues that the district court erred by concluding that the State ALJ—who had to decide the larger challenge to the IEP's substantive component, not merely the LRE question raised to the district court on appeal—used the wrong standard for measuring whether L.H. was receiving a meaningful benefit (i.e., could remain mainstreamed) at Normal Park, which led the court to improperly reject the State ALJ's findings. As the court made clear, the State ALJ most certainly did use the wrong standard. At the "due process hearing," HCDE—with support from its expert, Dr. Kabot—argued to the State ALJ that L.H. had to exhibit a "mastery" of the regular education grade-level curriculum. The State ALJ accepted that standard, found that L.H. could not meet it, and ruled for HCDE. But the district court rejected that standard, holding: "What the IDEA implies, the case law makes explicit: a child need not master the general-education curriculum for mainstreaming to remain a viable option. Rather, the appropriate yardstick is whether the child, with appropriate supplemental aids and services, can make progress toward the [] IEP['s] goals in the regular education setting." *L.H. #1*, 2016 WL 6581235, at *14–15 (citing multiple cases) (citations, quotation marks, editorial marks, and footnote omitted). With the proviso that *Endrew F.* modifies this only slightly if at all, *see Endrew F.*, 137 S. Ct. at 1000-01 (measuring for "appropriate progress" based "on the unique

---

[6]In an odd incongruity, HCDE asserts in its reply brief that "L.H. was receiving a FAPE at Normal Park," which is to say that he *was* receiving a meaningful educational benefit at Normal Park.

circumstances of the child for whom it was created"), the district court's holding is correct. The court then recited the testimony of HCDE's teachers, staff, and expert (Dr. Kabot), each having used the improper "mastery" standard, and concluded with a note that: "To be fair, in her testimony before this [c]ourt, Dr. Kabot retreated from that position, agreeing that the correct standard for a child with an IEP is not necessarily mastery of the general-education curriculum, but making progress on the child's individualized IEP goals. However, Dr. Kabot's ex post position is largely irrelevant to the question of what HCDE believed in 2012–2013." *Id.* at *15 n.12. Because the district court was correct that the State ALJ (and HCDE) had used the wrong standard, the court was also correct in rejecting the State ALJ's findings under that standard.

## C.

HCDE next argues that because the HCDE teachers' testimony at the "due process hearing" was directed at the challenge to the IEP's substantive component, not merely at the LRE question, the district court took that testimony out of context to conclude that they assessed L.H. under the wrong standard. Specifically, HCDE contends that "[L.H.'s] parents' demands for grade level standards necessitated that the educators address those demands in their testimony" and "none of HCDE's educators testified that such a standard existed." This claim is disingenuous. It is true that L.H.'s parents demanded that his goals be tied to the general-education curriculum, perhaps even unreasonably so, as the district court commented. *L.H. #1*, 2016 WL 6581235, at *16. It is also true that L.H. failed to meet those goals. *Id.* But "this establishes only that the goals . . . were not appropriately calibrated." *Id.* Whether L.H. was meeting his IEP goals (or even capable of meeting them) is a separate question from whether he was "making appropriate progress" or "receiving a meaningful benefit," and the HCDE teachers could have testified to the latter without the former. But that is not what happened. Numerous teachers testified that L.H. was not benefitting from his placement at Normal Park *because* he could not master the grade-level curriculum—that standard was improper, as Dr. Kabot even conceded. The district court did not misinterpret the testimony.[7]

---

[7]The district court addressed this claim directly in denying HCDE's motion for reconsideration:

Put simply, the [c]ourt understood the context underlying the testimony of L.H.'s teachers and each party's expert witness. The [c]ourt was aware that at various times L.H.'s parents asked that

**D.**

HCDE also argues that the district court gave too much weight to L.H.'s parents' experts, and accuses those experts of being unprepared, uninformed, incompetent, or overly general without the necessary focus on L.H. individually. Importantly, HCDE is not arguing that L.H.'s experts were *unqualified*, which could be framed as a legal challenge; HCDE is arguing that their testimony was *unpersuasive* due to the foregoing accusations, which is a challenge to the court's weighing of the evidence and determination of the facts. We review that challenge for clear error, *Deal*, 392 F.3d at 850, and HCDE comes nowhere close to showing any clear error.

The crux of this argument is that the district court should have deferred to the opinions of HCDE's teachers and staff because they had spent far more time with L.H. and were more familiar with his academic record and individual idiosyncrasies, so they knew best how he should be educated. If the law were that a court must defer to the opinions of those who spend the most time with the student and presumably know him best, then there would be no place for experts. Moreover, parents could never prevail because the student's teachers will always spend more time with the student or know the student better than the parents' hired experts. On the other hand, the parents spend more time with the student and know the student better than any teacher. Taking HCDE's argument to this ultimate end, the district court would actually defer to the student's parents, who surely know the student the best, regardless of any expertise.

The district court recounted testimony from all of the witnesses, both lay (e.g., HCDE teachers) and expert (from both sides). Although the court considered information about Down Syndrome generally, it then said "this does little to advance [the parents'] case unless [the parents] can show the proposition holds true for L.H." *L.H. #1*, 2016 WL 6581235, at *13. From there, the court considered L.H. individually. *Id.* at 13-18. There is no merit to HCDE's challenge to the district court's weighing of the testimony here.

---

his educational goals be tied to grade-level expectations. Despite what L.H.'s parents may have requested, [HCDE] was required to educate L.H. in the least restrictive environment. The fact that some of [HCDE]'s witness's statements were made in response to L.H.'s parents' requests did not cause the [c]ourt to misunderstand the testimony or interpret it out of context.

*L.H. #2*, 2017 WL 4553421, at *1 (E.D. Tenn. June 2, 2017) (citation and footnote omitted).

**E.**

HCDE argues that L.H.'s parents convinced the district court that "mainstreaming" is about physical location, whereas it is really about academic methodology. Not only is this contention wrong in many ways, it is a bit bizarre. HCDE's theory is that, because special-education students are so different from their classmates socially and intellectually, they are necessarily "isolated" from them even though they are physically in the same room. Thus, special-education students can never truly be "mainstreamed." Specifically, HCDE contends that L.H. was not mainstreamed at Normal Park, asserting that L.H.'s second grade teachers at Normal Park placed him "at his own table in the back of the classroom" and treated him so differently from the general student population that he "was essentially in a classroom of one even though he was physically located in the gen-ed classroom." HCDE then refers to a video of L.H. at TMS to claim that, even at TMS, "L.H. [was] functionally isolated from typically developing peers despite sitting in their midst." This is common, HCDE says, because "the academic gap between students with disabilities and typical peers can be so extreme that it is isolating and stigmatizing."

This is really an argument against "mainstreaming" as a concept, because HCDE believes it is impossible, impractical, or counterproductive. As defined in the statute, § 1412(a)(5)(A), "mainstreaming" means placing a disabled student "with children who are not disabled," such as in a general education classroom, whereas "not mainstreaming" would mean placing a disabled student in "special classes, separate schooling, or [conducting] other removal of children from the regular education environment," such as the Red Bank CDC. This directly contradicts HCDE's premise that mainstreaming is somehow a function of the child's disability rather than his placement by the school. This might be merely the view of HCDE's appellate attorneys, but if it is truly HCDE's view, then it is worrisome and inadvertently supports L.H.'s parents' experts' opinions that HCDE teachers and staff reject mainstreaming because they do not understand it, do not believe in it, and need extensive training on why it is valuable and how to do it. These actions at Normal Park do not demonstrate a failure of mainstreaming as a concept, but a failure of L.H.'s teachers and the other HCDE staff to properly engage in the process of mainstreaming L.H. rather than isolating and removing him when the situation became

challenging.  Finally, these accusations about L.H.'s isolation at TMS, while typical of HCDE's exaggerated and questionable criticism of TMS, are directly refuted by TMS teachers and staff as well as L.H.'s parents, who have been pleased with L.H.'s performance and progress at TMS.

**F.**

Finally, HCDE argues that because this is actually a case about academic methodologies, the governing standard is one of deference to the school teachers and staff per *McLaughlin*, 320 F.3d at 673.  First, HCDE repeats its claim that because L.H.'s Normal Park teachers had isolated him functionally, even though he was in a regular classroom, "L.H. had never truly been in the LRE and that [by advocating for a regular classroom, such as he was in at Normal Park,] his parents were not advocating for the LRE."  Next, HCDE contends that L.H.'s parents were only concerned with the *physical location* of L.H.'s placement (Normal Park Elementary rather than Red Bank Elementary), asserting that "neither [L.H.'s] parents nor the district court have taken issue with any aspect of the 2013-14 IEP apart from the location where L.H. would have been served."  Therefore, HCDE claims, because neither Normal Park nor Red Bank was actually mainstreaming L.H., the only complaint was "geographic location," so the court "repeated the same error that confused the trial court in *McLaughlin*," namely the failure to defer "to the educators' choice of methodologies."

As discussed above, this first premise is that L.H. should not be mainstreamed because the teachers and staff at Normal Park were unwilling or unable to properly engage in the process of mainstreaming L.H., as they deemed it futile or useless in light of his disability.  This is the type of approach that the IDEA was designed to remedy, not encourage or protect.  The second premise—that the only complaint about Red Bank CDC was "geographic location"—is another claim by HCDE that is at best disingenuous.  L.H.'s parents' primary complaint about Red Bank CDC was its intentional segregation (non-mainstreaming), which HCDE attempts to morph into a mere difference in physical location.  But, to be clear, L.H.'s parents opposed the CDC, not its location.  They also complained that Red Bank CDC's curriculum was not "mainstream" in that it was not a regular curriculum, it set very low educational expectations (far too low for L.H.'s individual capabilities), it was not peer reviewed or tied to state standards, it provided no report cards or homework, and it had certain teachers in uncertified roles.

In *McLaughlin*, 320 F.3d at 670 n.2, the parents opposed a move to a CDC at a different school, but only because they "wanted their daughter to attend [the neighborhood school,] Dimondale Elementary, and no other school," and conceded that "if a [CDC] had been available at Dimondale, [they] would not have objected to the appropriateness of a [CDC] placement." Unlike this case, in which L.H.'s parents want more interaction with non-disabled peers, want a peer reviewed and regular state certified curriculum, and want a more typical educational experience with homework and report cards, "the parties [in *McLaughlin*] did not disagree about the extent to which [the student] would be mainstreamed with non-disabled peers . . . [and] the disputed issue did *not* involve determination of the least restrictive environment," *id*. at 672. L.H.'s case is about which of two very different approaches provides the disabled student with the least restrictive environment; it is not merely about two different physical locations.

All in all, none of HCDE's arguments is persuasive. The district court was correct in finding that the proposed Red Bank CDC IEP did not provide the LRE, and therefore failed L.H.

**IV.**

In their cross-appeal, L.H.'s parents claim that the district court erred by finding that L.H.'s placement at TMS did not satisfy the IDEA. More importantly, due to that finding, the court concluded that the IDEA did not grant L.H.'s parents reimbursement for that placement.

As discussed, L.H.'s parents rejected the HCDE's segregated, disabled-students-only CDC at Red Bank, so they removed him from the HCDE public school system. According to their expert, Dr. Kathleen Whitbread, at that point they had two choices: homeschooling, which is obviously counterproductive to the idea of mainstreaming, or private schooling at TMS, at $7,500 annual tuition plus $9,000 to $17,128 per year for L.H.'s personal paraprofessional aide. L.H. has been at TMS for the past five schoolyears (third through seventh grades).

Parents who unilaterally move a child to a private school in response to an unacceptable IEP get reimbursement pursuant to the IDEA only upon a finding that both (1) the public school violated the IDEA and (2) the private school is appropriate under the IDEA. *Florence Cnty.*, 510 U.S. at 15. The private school need not meet full public school IDEA standards, *see* 34 C.F.R. § 300.148; *C.B.*, 635 F.3d at 1159, but it must be "reasonably calculated to enable a child

to make progress appropriate in light of the child's circumstances," *Endrew F.*, 137 S. Ct. at 999. We have also held that parents are not "entitled to reimbursement for private school just because the private placement is less restrictive than the public school placement." *Berger*, 348 F.3d at 522. "[A]t a minimum," the private school must "provide some element of special education services in which the public school placement was deficient"; for example, specific special-education programs, speech or language therapy courses, or tutoring services. *Id.* at 523.

Here, the district court found that the public school placement at Red Bank CDC violated the IDEA, but denied the parents reimbursement for the move to private school at TMS because it found TMS inappropriate under the IDEA. Despite finding that "L.H. has made some academic progress at TMS[,] . . . appears to be doing well behaviorally and socially, and the setting is certainly less restrictive than the CDC placement proposed by HCDE," the court rejected TMS because "the Montessori instructional approach is not sufficiently structured for L.H.'s individualized needs." *L.H. #1*, 2016 WL 6581235, at *23-24. Specifically, the court held that "L.H. needs systematic, intensive instruction on a number of 'building-block' skills [that] the Montessori instructional approach is not designed to provide." *Id.*

The court supported this conclusion with testimony from six HCDE teachers, staff, or experts: (1) Lisa Hope, L.H.'s special-education teacher at Normal Park; (2) Jeanne Manley, the HCDE special-education trainer of other teachers; (3) Willeata Kendrick, HCDE's special-education supervisor; (4) Dr. Susan Kabot, HCDE's contracted consultant and autism expert; (5) Debbie Rosenow, HCDE's reading coach; and (6) Jamelie Johns, HCDE's math coach. Each of these interested witnesses opined that TMS was inappropriate because the Montessori approach does not have a "systematic structure," *see id.* at *25 (citing as "undisputed fact that TMS offers little in the way of systematic instruction"), and L.H. needed a systematic, structured learning environment, in order to work on basic building-block skills, through frequent repetition, intense one-on-one instruction, and repeated prompting and reinforcement.

Whether or not the Montessori approach is as "structured" in its own way as the public school approach (i.e., the Red Bank CDC) is in its way, the record is clear that L.H. had a personalized curriculum at TMS and a paraprofessional aide dedicated just to him, such that he was working at his own pace with frequent repetition, intense one-on-one instruction, and

repeated prompting and reinforcement. The district court relied on HCDE's claims that the Montessori approach fails to provide this ambiguous "systematic structure"; those claims appear both overblown and unreliable. In fact, the parents' expert, Dr. Whitbread,[8] testified that the Montessori approach is "a curriculum that is well-suited for children with Down syndrome in many respects," and good for L.H. in particular. The court appears to have rejected TMS, at least in part (though a critical reading reveals it to be much more than merely in part) because the court rejects the Montessori approach in general. Under such a view, no Montessori school is qualified to teach a student with Down Syndrome. That cannot be.[9]

Regarding an individual evaluation of L.H. during his schooling at TMS, the district court recognized that he was mainstreamed *all the time* at TMS and was benefiting from it, but emphasized that the benefits of mainstreaming alone are not sufficient. *L.H. #1*, 2016 WL 6581235, at *26 ("[A]n educational environment that is otherwise inappropriate for L.H. cannot be considered 'proper under the IDEA' merely because it is a mainstream environment.") (citing *Berger*, 348 F.3d at 522). The district court explained that the private school in *Berger* could not satisfy the IDEA "because [it] lacked special-education services necessary for the student's development." *Id.* The court "[e]xtend[ed] this rationale to L.H.'s placement at TMS," *id.*, to conclude that "the mismatch between the Montessori approach and L.H.'s need for focused, systematic instruction in language and other basic skills, combined with the difficulty he has working independently in low-structure environments," meant that TMS was not proper. *Id.*

---

[8]Dr. Whitbread has 35 years of experience with Down Syndrome children, as a teacher, researcher, author, and consultant, and testified that she knows of no one in the United States with such a focus on Down Syndrome. Consider, for purposes of comparison, Dr. Kabot, HCDE's proffered expert who is under contract with HCDE to provide training and consultation services to the special education department. Dr. Kabot testified that Down Syndrome and autism are significantly different conditions and that her expertise is in autism but not Down Syndrome; she had not done research, published papers, or given presentations about children with Down Syndrome. Moreover, she did not review any published research before consulting and advising HCDE about placement for L.H.

[9]*Amici Curiae* Council of Parent Attorneys and Advocates cite two articles as support for the applicability and benefits of Montessori schooling for children with Down Syndrome: Jacqueline Cossentino, *Following All the Children: Early Intervention and Montessori* (2016) (available at https://www.public-montessori.org/wpcontent/uploads/2016/10/Following-All-the- Children-Early-Intervention-and- Montessori.pdf (last visited July 17, 2018)), and Barbara Schramm, *Case Studies of Two Downs Syndrome Children Functioning in a Montessori Environment* (1974), (available at https://files.eric.ed.gov/fulltext/ED111120.pdf (last visited July 17, 2018)).

While the facts of this case might not conclusively distinguish it from *Berger*, neither is this case factually identical to *Berger*. Whereas in *Berger* the private school was merely "less restrictive" than the public school, *Berger*, 348 F.3d at 522, this case presents a situation contrasting all and none: TMS is fully and intentionally mainstreamed whereas Red Bank CDC is fully and intentionally segregated. Also, TMS satisfies the requirement that the private school must "provide some element of special education services in which the public school placement was deficient" *id.* at 523. TMS provides mainstreaming, but it does not offer *only* the benefits of mainstreaming. Unlike Red Bank CDC, TMS provides a curriculum tied to the regular state standards. At TMS, L.H. produces a daily journal, has nightly homework, and receives report cards, all of which facilitate his parents' involvement, and convey to L.H. that this is a regular school experience. Red Bank CDC has no homework or report cards. As to L.H.'s need for focused, systematic instruction with individual motivation and feedback, TMS provides him with an involved, qualified teacher and an individual aide. Finally, the district court relied on its credibility assessments and HCDE's contrary views of L.H.'s progress at TMS to discount TMS's evidence that L.H. had made appropriate academic progress. But the court did not discuss L.H.'s parents' views about L.H.'s progress at TMS or their overall satisfaction with it.

HCDE further argues that we must also or alternatively deny reimbursement to L.H.'s parents because they could have invoked the IDEA's "stay put" provision, § 1415(j), and kept L.H. at Normal Park where, according to HCDE, he was receiving a FAPE.[10] According to HCDE, L.H.'s parents did not believe that Normal Park "had suddenly become an inappropriate placement," but rather "were simply indignant that the teachers had suggested a part-time CDC placement" at Red Bank CDC. Maybe it is true that L.H.'s parents were indignant at that "suggestion," which was obviously more than a suggestion, but they also had reason to be concerned that those teachers—who had backed up that "suggestion" by insisting that they could not and would not provide the necessary support services to L.H. at Normal Park—were unwilling to teach L.H. under any circumstances. Moreover, as already discussed, these Normal

---

[10]But HCDE cannot have it both ways. If Normal Park was actually meeting all of L.H.'s needs and providing a FAPE, as HCDE here contends, there was no reason to remove L.H. to Red Bank CDC. HCDE's removal of L.H. to Red Bank CDC, over his parents' objections, was the entire reason for this suit.

Park teachers were openly unwilling or unable to properly engage in the process of mainstreaming L.H., rather than isolating and removing him when it became challenging.

We conclude that the educational program at TMS satisfied the IDEA and, therefore, L.H.'s parents were entitled to reimbursement. The district court erred in holding otherwise. Because the appropriate amount of reimbursement is not evident from this record, however, we must remand for the district court to admit such additional evidence as it deems necessary and render judgment in the amount of reimbursement that it finds appropriate under the IDEA.

## V.

For the foregoing reasons, we AFFIRM the district court's decision that the school district's segregated placement violated the IDEA, but REVERSE its decision that the parents' alternative private placement did not satisfy the IDEA and REMAND for a determination of the appropriate amount of reimbursement and issuance of a judgment consistent with this opinion.