NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0368n.06

No. 21-3244

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 09, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| C.K., a minor, by and through his parent, S.R., | ) ) | |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| BOARD OF EDUCATION OF SYLVANIA CITY SCHOOL DISTRICT, | ) ) ) | |
| Defendant-Appellee. | ) ) | |

Before: WHITE, THAPAR, LARSEN, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** S.R., acting on behalf of her son, C.K., an elementary school student with several learning disabilities, appeals the district court's reversal of a State Level Review Officer (SLRO)'s decision ordering that C.K. be officially placed in—and that Defendant-Appellee Sylvania School District (Sylvania) pay for—private remedial programming. We affirm and remand for an additional determination.

## I. BACKGROUND

### A. C.K.'s educational history

#### 1. Birth to first grade (2007–15)

C.K. was born in November 2007. After missing several developmental milestones as a toddler, C.K. was diagnosed with autism before age two. Upon receiving this diagnosis and for several years, C.K.'s parents enrolled him in a variety of programs aimed at addressing his developmental needs. While in kindergarten, C.K. began to exhibit difficulties with reading and

learning his letters. When a pediatrician told C.K.'s parents that they needed to enroll C.K. in a phonics-based program, they hired a reading specialist, Tammy Alexander, who was certified in the Orton-Gillingham reading method[1] and employed it with C.K. Alexander tested C.K., determined that he was "nonreading," and began working with him on his reading from the remainder of his kindergarten year through first grade, in 2014 and 2015.

In first grade, C.K.'s individualized education program (IEP)[2] provided for individual or small-group reading intervention with a specialist for thirty minutes per day, five days per week in the areas of reading, spelling, and mathematics. The IEP noted that, while C.K. "demonstrated average abilities on the matching letters and number concepts," he "demonstrated very low abilities on phonological processing such as rhyming, blending, deletion[,] and phoneme identification and segmentation." *Id.* at 2902. According to an October 2013 administration of the Wechsler Individual Achievement Test 3d Ed. (WIAT-III) standardized test, which "measures reading, math, and writing expression compared to same age peers," C.K. tested "below average" on early reading skills, receptive vocabulary, oral expression, expressive vocabulary, sentence repetition, numerical operation, math problem solving, alphabet writing fluency, and spelling. *Id.* He tested "average" only for oral word fluency. *Id.*

### 2. Second grade (2015–16)

In the fall of 2015, C.K.'s parents enrolled him in second grade in the Sylvania School District because they "felt he was ready for a large classroom." *Id.* at 3661. According to the

---

[1] The Orton-Gillingham method is a "teaching method designed to educate students with dyslexia and other learning disabilities" that is "multisensory, explicit, repetitive, and sequential." R. 27, PID 2329.

[2] An IEP, or "individualized education program," is "a written statement for a child with a disability that is developed, reviewed, and revised in accordance with" federal disability and education law. 34 C.F.R. § 300.22. An IEP is a "statement of measurable annual goals" designed to "[m]eet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum," and is subject to strict requirements under the IDEA. *See id.* § 300.320(2)(i).

Woodcock Reading Mastery Test III (Woodcock Test), administered and scored by Alexander in October 2015, C.K.'s reading ability at the beginning of second grade ranged from a kindergarten to first-grade level.[3] Sylvania took this information into account when, at the beginning of C.K.'s matriculation into the school district, it prepared an Evaluation Team Report (ETR)[4] for him in December 2015. The ETR noted that, as of October 2015, C.K. continued to qualify for special-education services. At the time, C.K. was reading at level 3 of the Diagnostic Reading Assessment (DRA)—average end-of-year first graders tend to read at levels 16 to 18—and his performance on the Standardized Test for the Assessment of Reading (STAR), a curriculum-based measurement, indicated that he was "not yet a reader." R. 30, PID 2945. The ETR concluded that C.K. had education needs in the areas of reading, executive functioning, and social communication.

Sylvania prepared a new IEP for C.K. in December 2015, which provided for 100 minutes weekly of small-group multi-sensory reading decoding intervention, five days per week, through an intervention specialist. The IEP also provided for intervention in the areas of social communication, writing, executive functioning, and occupational therapy. In addition to the interventions in the IEP, C.K.'s parents hired two private tutors—an intervention specialist and a certified reading specialist—to work with C.K. two to four hours per week outside of school.

---

[3] Specifically, C.K. was in the 5th percentile for phonological awareness and ability to read or decode pseudowords ("word attack"); the .2nd percentile for word identification and passage comprehension; the 1st percentile for letter identification, spelling, and sound-symbol knowledge; and the 23rd percentile for listening comprehension.

[4] An ETR is a report that comprises all of the documents prepared by any individual within a school—such as a teacher, therapist, or psychologist—"who is working directly with" the impacted child. R. 35, PID 3786. The ETR compiles all available assessments about and observations of the child, which the school psychologist then summarizes so that the child's education team can determine "what the child's needs are" and "if there is any implication for their instruction or if a child might need accommodations." *Id.* The ETR also compiles information volunteered by the child's family and any private parties whom the parents have hired to examine the child.

In February 2016, C.K.'s parents became concerned because he had not "mastered kindergarten skills," including that he had not "learned all of the letters or their corresponding sounds," *id.* at 3649, and had C.K. evaluated by pediatric psychologist Dr. Mark Bowers. Bowers diagnosed C.K. with ADHD and dyslexia in addition to his autism. Bowers concluded that although C.K. demonstrated average intelligence compared with his peers and showed "age-appropriate logical thinking skills," he showed "weak performance on working memory tasks," which particularly affected his reading abilities and certain executive functions. *Id.* at 2408–10. Addressing C.K.'s reading deficits, Bowers recommended "[t]he Lindamood-Bell[5] Visualize and Verbalize approach as well as Orton-Gillingham method" to "build phonemic awareness, word reading, and reading comprehension." *Id.* at 2410. Additionally, in March 2016, C.K. began taking medication for his ADHD.

Also in March 2016, C.K.'s parents had him evaluated by LMB. LMB administered a variety of tests to C.K.—including the Woodcock Test, the Slosson Oral Reading Test (Slosson Test), and the Wide Range Achievement Test (WRAT)—that together suggested C.K. was in the 1st percentile of his age group for "word attack" and spelling, the 4th percentile for oral reading, and the .4th percentile for word reading. LMB representatives told C.K.'s parents that he "had significant reading delays; that he would need a lot of reading intervention; and that it would take a lot of time" to assist C.K. with his delays. R. 34, PID 3651. In response, S.R. signed C.K. up for a twelve-week LMB intensive intervention program consisting of four hours of daily instruction, five days per week, with a private LMB tutor, to begin during the school year in May

---

[5] Lindamood-Bell, or "LMB," describes itself as a private "learning center" for reading that "focuses on remediation for students, mainly in fluency and comprehension" and provides "intensive instruction to help students make gains" in the student's particular area of need. R. 34, PID 3687–88.

and extend through the summer. S.R.'s hope was that, with the LMB program, C.K. would "catch . . . up before starting third grade." *Id.* at 3002.

S.R. called a team IEP meeting in March 2016 to discuss C.K.'s medication and reading program. Teachers and S.R. agreed at this meeting that "[s]ignificant progress has been seen with regards to where [C.K.] was at the start of the school year until now," but that "even with the progress that has been made, [C.K.] continues to be behind with his reading skills in comparison to typical peers." *Id.* at 3002.

With Sylvania's reluctant permission, C.K. missed the first half of each school day for the rest of second grade in order to attend the LMB reading program.[6]

C.K. continued with the intensive LMB tutoring program from May 2016 through the summer for fourteen weeks. On August 11, 2016, an unidentified LMB employee performed the same tests, using the same test form, that LMB had given C.K. in March 2016. According to LMB's August 2016 tests, some of C.K.'s reading scores improved.[7] R. 28, PID 2471–72. After receiving these LMB test results, Bowers recommended continued "intensive and ongoing reading intervention" through a "combination of research-based reading interventions during the school day (e.g., Wilson, Orton-Gillingham) as well as ongoing private tutoring outside of school (e.g.,

---

[6] Though Sylvania ultimately agreed to allow C.K. to miss class for the LMB program, the IEP team required S.R. to sign a document stating that she placed C.K. in the program at her own expense, with full understanding that Sylvania did not agree that it was a necessary placement. The IEP for this time reflects that Sylvania also "listed logistical concerns such as grades, missed ELA instruction, district testing and end of the year services." R. 30, PID 3001–02.

[7] Specifically, C.K.'s "word opposites" score rose from below 1st to the 9th percentile, his "oral directions" score rose from the 2nd to the 37th percentile, his word attack score rose from the 1st to the 19th percentile, his oral reading rose from the 4th to the 9th percentile, his word reading rose from the .4th to the 23rd percentile. However, his picture vocabulary dropped from the 77th to the 73rd percentile, his "verbal absurdities" raw score dropped from 13 to 10, and his spelling remained at the 1st percentile.

Lindamood-Bell, Brainspring)." R. 28, 2421. Bowers specifically recommended 30–60 minutes of reading intervention during the school day, 4–5 times per week.

### 3. Third grade (2016–17)

During C.K.'s third-grade year, Susan Garrett, a Wilson[8]-certified intervention specialist, provided C.K. with IEP intervention during school hours in the areas of reading decoding, written expression, executive functioning, and social communication. During this time, C.K. also participated in LMB online tutoring for an hour each morning before school and for several hours on Saturdays. Garrett and the LMB tutors occasionally communicated and shared strategies.

In December 2016, C.K.'s IEP team met for his annual review. LMB representatives also attended this meeting. The December 2016 IEP noted that S.R.'s goal was that C.K. "have his reading, writing, and spelling skills at a level where he can independently complete his homework." R. 42, PID 4111. The IEP also noted that C.K.'s STAR math and reading assessments had improved since fall 2016, with his rank improving from 1% to 8% (though still remaining in the "red-urgent intervention" level) in reading. *Id.* at 4112. The IEP additionally noted that C.K. had received

> direct instruction on IEP goals and objectives outside of the classroom for 225 minutes per week with his intervention specialist. [C.K.] works on his goals and objectives during his 15 minute core plus time 5 days a week and 30 minutes small group for ELA goals 5 days a week. He works with the speech pathologist on the direct instruction objectives for 30 min. weekly. He also receives OT support for sensory 2x a day along with assistance in end of the day routine. [C.K.] has become independent with the end of day routine. He independently records assignments in his agenda, and packs up independently.

---

[8] The Wilson reading program is a multi-sensory reading program that incorporates Orton-Gillingham approaches. R. 35, PID 3763, 3794; *see also* R. 27, PID 2263 ("The Wilson program is a brand-name version of the Orton-Gillingham method.").

*Id.* It also reported that C.K. was reading at an independent level 6 on the DRA, meaning that he was reading at a beginner-to-middle first-grade level. The IEP stated that C.K. had mastered three of his four prior reading-decoding objectives, and partially mastered a fourth. He had also mastered his executive-functioning goals and objectives and mastered or partially mastered his social-communication objectives. *Id.* at 4114–15, 4119–122.

In February 2017, LMB performed follow-up testing suggesting that, since August 2016, C.K.'s reading scores had largely improved.[9] R. 42, PID 4118, 4122.

In May 2017, C.K.'s IEP team met to discuss his eligibility for Extended School Year ("ESY") services over the summer. The entire team—including C.K.'s mother and grandmother—determined that, "based on gathered data and performance over the past year, [C.K.] does not meet the eligibility for ESY." R. 30, PID 3006. Testing around this time suggested that C.K. could read 31 words per minute with an 81% accuracy rate. At the DRA Level 12, he was at the "developmental" level for fluency and "independent" level for comprehension and could read 40 words per minute. At Level 18 (beginning of second grade), his fluency was "instructional," his comprehension was "independent," and he could read 48 words per minute with 89% accuracy. R. 29, PID 2726. Additionally, in the Spring of 2017, C.K. achieved a score of 740 on the Ohio

---

[9] Specifically, C.K. had progressed from the 73rd to the 84th percentile in the Peabody Picture Vocabulary Test (Peabody), his "verbal absurdities" score had increased from 10 to 16, and according to the Woodcock Test his "word attack" skills had increased from the 19th to the 58th percentile—a jump from a 2-grade equivalent to a 4.5-grade equivalent—his oral reading had increased from the 9th to the 25th percentile—a jump from a 1.6 grade equivalent to a 2.9 grade equivalent—his "word reading" had increased from the 23rd to the 25th percentile, and his spelling had increased from the 1st to the 7th percentile. R. 28, PID 2471–72. However, his Peabody "oral directions" score had decreased from the 37th to the 9th percentile. *Id.*

State Wide Reading Assessment—up from 617 in Fall 2016—which put him in the category of "accelerated."[10]  R. 30, PID 3266.

During the summer of 2017, C.K. participated in another LMB reading-intensive program four hours per day, five days per week.  He had no other interventions.  Based on LMB's post-program testing in August 2017, as compared to its identical testing in February 2017, C.K.'s reading scores largely declined.[11]

### 4.  Fourth grade (2017–18)

C.K.'s parents decided not to enroll him in LMB during fourth grade.  They made this decision because C.K. had begun to exhibit signs of burnout by the end of third grade—including contracting mononucleosis in Spring 2017—and because they believed that C.K.'s reading "had gotten close to grade level by the end of the previous year."  R. 34, PID 3652, 3685.  However, pursuant to his Sylvania IEP, C.K. received 100 minutes of intervention weekly in the area of reading decoding (which included guided practice, repeated reading, and a multi-sensory instructional approach), 75 minutes weekly in the area of written expression (which included modeling, scaffolding of materials, and training in the use of editing checklists), and 50 minutes weekly each in the areas of executive functioning and self-regulation.

---

[10] According to the Ohio State Tests English Language Arts Score Report, a "student with a score of Accelerated finds a main idea that is indirectly stated in a story, drama, or historical or scientific text, analyzes events and procedures in a text, and shows strong command of English-language rules."  R. 28, PID 2502.

[11] Specifically, his Peabody Picture Vocabulary scores decreased from the 84th to the 63rd percentile, his "oral directions" percentile decreased from the 9th to the 5th percentile, his "word attack" score decreased from the 58th to the 34th percentile, his Slosson oral reading score decreased from the 25th to the 13th percentile, his word range score decreased from the 25th to the 16th percentile, and his spelling decreased from the 7th to the 2nd percentile.  R. 29, PID 2773–74.  C.K.'s performance on the Symbol Imagery Test also decreased from the 87th to the 25th percentile.  *Id.* at 2776.  However, his Peabody "verbal absurdities" score increased from 16 to 20.  *Id.*

In October 2017, C.K.'s IEP team met to discuss C.K.'s progress. C.K.'s reading interventionist, Jenny Morgan, "reported that [C.K.] is progressing well on the skills being taught through the Wilson reading program." R. 30, PID 3056. C.K.'s other intervention specialists also reported progress in his areas of executive functioning and self-regulation. The team agreed that "[r]eading decoding and written expression goals would be updated based on the progress that has been made and the next set of targeted skills that need to be addressed." *Id.* at 3057.

When the IEP team met again in November 2017, they determined that C.K. had achieved his three reading-decoding objectives, which together showed "mastery" over the reading goal of "apply[ing] phonics and word analysis skills to accurately and automatically decode words at the mid 2nd grade level with 80% accuracy in 4/5 opportunities."[12] R. 30, PID 3062. The IEP from this time also notes that C.K.'s STAR reading score had increased from 152 in August 2017 to 234 in November 2017 (both scores falling within the category of "Red Meaning Urgent Intervention"), R. 30, PID 3060–61, and that he was reading independently at a DRA 14 level, which is a benchmark for the end of first grade (with the benchmark for the beginning of fourth grade being 40). He was "instructional" at a DRA level 18. *Id.* at 3063. According to the Information Reading Inventory (IRI) words-in-isolation assessment, C.K. was "independent" for word-recognition at grade 2. *Id.* at 3063. C.K. additionally mastered all of his executive-functioning objectives and some of his social-communication objectives.[13] R. 30, PID 3067, 3071.

---

[12] Specifically, C.K. had mastered his objective to "accurately and automatically read 80% of the 2nd grade High Frequency Words (Dolch) in 4/5 opportunities" "in and out of context," though he missed the word "buy;" had mastered his objective to "identify 'Hunks' and 'Chunks' to help him sound out an unfamiliar word, with 80% accuracy on 4/5 opportunities" "when presented in context;" and had mastered his objective to "use context clues to confirm or self correct word recognition and understanding as necessary, with 80% accuracy in 4/5 opportunities." R. 30, PID 3062.

[13] During this time, S.R. appeared to be particularly pleased with C.K.'s progress. In an October 2017 email to the school, S.R. noted that "Team [C.K.] has shown its ability to be data driven, best practice

The 2017 IEP stated that Sylvania would provide the following services:

- For the goal (1) of Reading Decoding, Sylvania would provide C.K. with 100 minutes weekly of "direct instruction in the area [of] reading decoding to include guided practice, repeated reading and a multi sensory approach" with an intervention specialist in a special education classroom;

- For the goal (2) of Self-Regulation, Sylvania would provide C.K. with 50 minutes weekly of "direct instruction in the area of self regulation to include strategy drill and practice, modeling, feedback and support during generalization in the classroom through visual[ization]" with an intervention specialist in a special education classroom and 30 minutes monthly of "direct instruction of visual rating scales with self calming/alerting sensory strategies to be rehearsed through instruction, skill building, repeated practice, and corrective feedback" with an occupational therapist in a designated therapy room;

- For the goal (3) of Social Communication, Sylvania would provide C.K. with 120 minutes monthly of "direct instruction in social communication with peers and teachers in both small and large group settings using modeling, guided practice, role-play, and corrective feedback" with a speech language pathologist in a designated therapy room;

- For the goal (4) of Written Expression, Sylvania would provide C.K. with 75 minutes weekly of "direct instruction in the area of written expression to include modeling, scaffolding of materials and training in the use of editing checklists" with an intervention specialist in a special education classroom; and

- For the goal (5) of Executive Functioning, Sylvania would provide C.K. with 50 minutes [presumably weekly] of "direct instruction in the area of executive functioning to include guided skill instruction, modeling and visuals"

*Id.* at 3073–74. The entire IEP team signed off on the new IEP. *Id.* at 3079.

In January 2018, S.R. hired a private tutor, Jenna Heuring, to provide C.K. with additional reading intervention after school. S.R. had been working with C.K. herself but decided to hire a tutor because she believed "C.K. was making limited progress" and she "was finding it

---

influenced, eclectic and Highly Successful in helping [C.K.] remediate or close, deficits and gaps between him and his neurotypical peers. This happens with a Team Approach and high levels of commitment from involved parties." R. 29, PID 2735. Additionally, in a February 2018 email to the school, S.R. noted that "[a]s long as [C.K.] maintains the same continuity and rate of learning you will not hear any complaints from me. . . since [C.K.]'s reading intervention needs are so strong and he's finally making progress with generalization and long-term retention of his reading skills." R. 29, PID 2738.

increasingly hard to work effectively with [him] and keep his brother on task." *Id.* at 3653. Heuring worked with C.K. on phonics through the LMB method and another method, MobyMax.

In March 2018, C.K.'s IEP team met at S.R.'s request to discuss upcoming state assessments and the possibility of ESY services over the summer. S.R. was concerned about C.K.'s progress because she believed, based on what her private tutor had reported at home, that C.K. was beginning to show signs of regression. As she explained, "C.K. was starting to make errors that he shouldn't be making. He shouldn't be confusing an N with an H. Those were issues that had been remediated a long time ago, and if they were popping up, that showed that there was something significant going on with him."[14] R. 34, PID 3654.

At the meeting, Sylvania representatives explained to S.R. that C.K. would not qualify for ESY unless he was beginning to show regression. *Id.* According to the IEP team meeting report, the IEP team informed S.R. that

> data will continue to be gathered throughout the school year (particularly after extended breaks such as summer after the previous school year, as well as after winter and spring breaks), and a decision based on that data will be made in May prior to the end of the school year. Progress on IEP goals and objectives, STAR data points and IRI (Information Reading Inventory) performance gathered by the district throughout this school year will be used to make that determination.

R. 30, PID 3082. The meeting notes additionally state that

> [a]ll three teachers in attendance for the meeting agreed that [C.K.] is doing well overall and that he is making growth both academically and socially. Academically he is utilizing and applying strategies that have been previously taught, and socially

---

[14] LMB testing from around this time, in March 2018, showed both progress and regression as compared to the last round of testing it administered in August 2017. According to LMB's data, C.K.'s spelling had increased from the 2nd to the 8th percentile, his Gray Oral Reading Test rate had increased from the 1st to the 2nd percentile, his comprehension had increased from the 25th to the 37th percentile, his word attack score had decreased from the 15th percentile to the 9th percentile, his oral reading had decreased from the 13th to the 11th percentile, his paragraph reading had decreased from a 2.0 to 1.9 grade equivalent, his accuracy had decreased from the 2nd to the 1st percentile, his word attack score had decreased from the 34th to the 5th percentile, his Slosson oral reading test had decreased from the 13th to the 11th percentile, and his fluency had remained at the 1st percentile.

> he is initiating and engaging in peer interactions. Mom shared that based on her data from home (MobyMax Reading), [C.K.]'s current instructional reading level is at the 2nd grade which aligns with the current IRI reading data gathered at school. Mom expressed some concern with [C.K.] reversing some numbers (such as saying 17 instead of 71). When this happens at school, [C.K.] is prompted to slow down, look at the number again and then he is able to correct himself. At school when [C.K.] makes these types of errors, it is usually as a result of him attempting to work too quickly, because when he is prompted to slow down his accuracy significantly increases.

R. 30, PID 3083. When S.R. was informed that C.K. would need to show regression during school breaks in order to qualify for ESY, S.R. stated that she would prevent C.K. from reading over spring break. School officials interpreted S.R.'s comment as an attempt to have C.K. "score lower after break, hoping that ESY would be considered eligible after that." R. 36, PID 3872–73. The team resolved to make a final ESY determination in May.

In May 2018, the IEP team met again to discuss C.K.'s progress and the possibility of ESY. S.R. informed the school that she believed C.K. had "not made any growth in reading this school year." R. 30, PID 3088. Although the school and state-administered standardized testing showed mixed results, they largely showed growth over the academic year.[15] According to C.K.'s teachers, C.K. also made progress on his IEP goals and mastered many of his fourth-grade objectives.

---

[15] Specifically, testing in May 2018 showed that C.K. was reading independently at a DRA level 18 with 98% accuracy, an improvement from March 2018, in which he was reading at a DRA 18 with 89.7% accuracy. Additionally, according to an April 2018 IRI word lists test, C.K. was reading independently at levels pre-primer, primer, 1, and 2, instructionally at level 3, and broaching material in level 4 at level "frust." These scores were largely improved from November 2017, in which he had been reading instructionally at levels pre-primer and 2, at level "frust" for primer, independently at levels 1 and 3, and had not yet been tested on 4. R. 30, PID 3090. C.K.'s progress report noted at multiple points that the accuracy of his reading improved dramatically when he was prompted to slow down and sound out his words. *Id.* at 2749–50. C.K.'s most recent STAR assessment score in reading was a 336 (yellow-intervention), which is in the 12th percentile and represented his highest STAR score all year. However, his May 2018 statewide reading test stated that his reading level had fallen from 740, or "accelerated," in Spring 2017 to 626, "limited." R. 28, PID 2502 (According to the Ohio State Tests English Language Arts Score Report, a "student with a score of Limited has a hard time explaining a text and drawing simple conclusions, figuring out the meanings of basic words, organizing thoughts into writing, and showing commands of the rules of English.").

C.K.'s interventionist, Lindsay DeLong, attempted to show S.R. a spreadsheet that compiled the district assessments—IRI word lists, IRI passages, STAR scores, DIBELS, and DAZE—dated from Spring 2017 through May 2018 that Sylvania believed showed progress, including over school breaks. Sylvania officials believed that the spreadsheet demonstrated, among other things, that C.K. had not regressed during school breaks—including over Spring Break, where he had not practiced his reading, and during which his reading had actually increased from a 2.9 grade equivalent in March 2018 (red-urgent intervention) to a 3.1 grade equivalent in April 2018 (yellow-intervention).

S.R. was not persuaded by the assessments and argued that C.K. was not performing as well at home as he was in school. The meeting ended, and Sylvania determined that, based on data gathered "every nine weeks as well as . . . before and after extended breaks from school," C.K. did not qualify for ESY for the summer of 2018. R. 30, PID 3086.

After this meeting, S.R. filed an unrepresented due-process complaint against Sylvania in May 2018, claiming that the district failed to provide C.K. with a Free and Appropriate Public Education (FAPE) under the Individuals with Disabilities Education Act (IDEA).[16] The filing of the complaint triggered the IDEA's "stay-put" provision, which requires that, upon filing a due-process complaint, "the child shall remain in the then-current educational placement of the child" unless the parents and educational providers all agree otherwise. *See* 20 U.S.C. § 1415(j). From that point forward, C.K.'s educational placement could not be modified from the November 2017 IEP without the consent of the entire IEP team. *See id.*

---

[16] S.R. subsequently amended this complaint, with the help of counsel, on September 10, 2018.

Over the summer of 2018, S.R. enrolled C.K. in the same LMB summer tutoring program that he had completed the prior summer, and LMB provided intervention for four hours per day, five days per week. LMB started C.K. over from the beginning of the Seeing Stars program, and by the end of the summer his scores, as measured by LMB, had largely increased or stayed the same.[17]

### 5. Fifth grade (2018–19)

Before the school year began, C.K.'s parents determined that he would participate in two hours of private LMB reading intervention every morning during fifth grade. From 8:30 to 10:30 a.m., a private LMB tutor would work with C.K. on his reading objectives in the church adjacent to C.K.'s school. C.K.'s parents made this determination without consulting the IEP team and then informed Sylvania of the plan shortly before the school year started.

In August 2018, C.K.'s parents had him re-evaluated by Bowers, who administered a number of tests and concluded that, while C.K.'s "WIAT-III Word Reading and Pseudoword Decoding have slightly increased in his previous three evaluations with the undersigned," C.K.'s working memory was still weaker than that of other children his age, and he "continue[d] to have significant reading challenges." R. 28, PID 2429, 2431. Bowers's report emphasized that, "[w]hen interpreting [C.K.'s test] scores, it is important to view the results as a snapshot of his current intellectual functioning." *Id.* at 2430. Bowers recommended "intensive and ongoing reading

---

[17] LMB testing in August 2018 demonstrated that, compared to its last test in March 2018, C.K.'s "word attack" score had increased from the 5th percentile to the 32nd percentile, his Slosson oral reading increased from the 11th to the 16th percentile, his paragraph reading increased from a 1.9 to a 2.6 grade equivalent, his third-grade recall increased from 75% to 100%, and his accuracy increased from the 1st to the 5th percentile. However, his spelling decreased from the 8th to the 7th percentile, his first-grade recall decreased from 88% to 75%, his reading rate stayed at the 2nd percentile, his fluency stayed at the 1st percentile, his second-grade recall remained at 100%, and his comprehension stayed at the 37th percentile. R. 28, PID 2689–90.

intervention," including "a combination of research-based reading interventions during the school day (e.g., Orton-Gillingham)" that constitute a "strong dosage of reading intervention," such as "120-180 minutes/day, 4-5 days per week." *Id.* at 2431. Bowers also provided numerous recommendations for academic accommodations, such as extended time for test-taking and homework.

After S.R. provided notice to Sylvania that C.K. would be missing the first 90 minutes of school each day for LMB tutoring, C.K.'s IEP team conducted a meeting on August 22, 2018, immediately after the start of the school year. The LMB tutoring would result in C.K. missing his full math class every day, and Sylvania officials wanted to discuss options because they were concerned about C.K. "missing core instruction." R. 28, PID 3891. Additionally, the IEP team agreed to conduct C.K.'s ETR early so that the evaluation data would be available for his 2018 IEP review.

Accordingly, in advance of the IEP team meeting, Sylvania representative Jessica Positano emailed S.R. a summary of the typical fifth-grade curriculum and provided three scheduling options that Sylvania believed would provide the necessary IEP services and allow for C.K. to attend school full-time. The typical fifth-grade schedule, which ran from 9:10 a.m. to 3:25 p.m., provided for 67 minutes of math instruction, 155 minutes of ELA instruction or Science/Social Studies instruction, 45 minutes of lunch/recess, 50 minutes of "core +," and 55 minutes of "specials."

- **Option 1** followed the typical schedule, allowing for flexibility depending upon C.K.'s updated IEP goals, and would allocate his "core +" time for the reading intervention specialist three to five days per week.

- **Option 2** was similar to Option 1 but offered an additional thirty minutes of reading decoding intervention with Garrett using Wilson reading-based strategies.

- **Option 3** would allow C.K. to transfer to another school for part of the day, where an intervention specialist trained in both LMB and Orton-Gillingham methodologies would work with C.K. Sylvania would transport C.K. to and from the other school, and C.K. would attend all other classes at his regular school as normal.

*Id.* at 3096–98.

S.R. rejected all of the proposed options at the August 22, 2018 meeting, noting that the LMB intensive program was the "gold standard" for reading, and countered that Sylvania could provide C.K. with an intervention specialist to work with him on the mathematics that he would miss during the morning.[18] Sylvania responded that intervention specialists do not work individually with students on core subjects and that it would not be feasible to hire an additional teacher to work individually with C.K. in math. Additionally, C.K. did not, at that time, qualify for IEP intervention services in math. According to Sylvania's notes regarding this meeting, C.K.'s family "acknowledge[d] that the district has made progress with" C.K., but believed that he "need[ed] intensive reading intervention and that the services the district are providing are too little." *Id.* at 3098. S.R. stated that the LMB tutoring was "nonnegotiable," R. 35, PID 3783, and that C.K. did not "need 70 minutes of math instruction" if he could get intensive reading instruction and private math tutoring instead. R. 30, PID 3098.

S.R. also requested, at this meeting, that Sylvania pay for C.K.'s LMB services. Sylvania refused because it believed that "unilaterally enrolling [C.K.] in a private program during the school day[] is not appropriate or necessary" and that the district was "capable of providing FAPE and is providing FAPE." R. 30, PID 3099.

Beginning on September 11, 2018, S.R. removed C.K. from school for the first ninety minutes every day to provide private reading tutoring. C.K. did not attend math class.

---

[18] It was important to C.K.'s parents that he receive reading tutoring in the morning because that is when his ADHD medication was most effective.

On September 13 and 21, 2018, C.K.'s IEP team met to review his progress and discuss potential amendments. The team determined that C.K. had mastered two of his four reading decoding objectives (reading words containing closed syllables with 80% accuracy in 4/5 opportunities in and out of context; and reading closed syllable words containing blends, 4-5 sounds, plus a suffix with 80% accuracy in 4/5 opportunities, in and out of context) and it amended some of his goals and objectives. Specifically, the team modified his social-communication goal to focus on participating in peer-to-peer conversations rather than conversations with teachers. The team additionally added information to the IEP regarding C.K.'s current accommodations and modifications, taking into account a report written by Bowers that S.R. had provided to the district.[19]

On November 8 and 12, 2018, the IEP team met again to review the results of C.K.'s ETR evaluation. It concluded that C.K. had a continued need for specialized instruction in reading decoding, written expression, and self-regulation, but that he likely no longer needed speech services or instruction in executive functioning.

The majority of the IEP team also concluded that, even though there was "insufficient information available to support the existence of a math disability at this time" due to C.K. having missed thirty-two days of math instruction that academic year, he likely did not need specialized math services because previous long-term math assessments had shown him to perform at or above grade level in that subject area. S.R. signed the ETR as a participant but disagreed with the recommendation that C.K. did not qualify for math services.

---

[19] S.R. signed off on these IEP amendments, but, relevant to the appeal, disagreed with Sylvania's failure to formally integrate LMB into C.K.'s IEP.

On November 19, 2018, C.K.'s IEP team met again for C.K.'s IEP annual review. The school proposed discontinuing C.K.'s services in social communication and executive functioning; increasing reading-decoding services from 100 minutes per week to 125 minutes per week; increasing written-expression services from 50 minutes per week to 75 minutes per week; and amending several accommodations. S.R. left the IEP meeting early and did not sign off on the changes. Because of the stay-put law, the changes could not be implemented without agreement from all parties, and the November 2017 IEP, as amended on September 21, 2018, remained C.K.'s default plan.

## B. The Impartial Hearing Officer's decision in favor of Sylvania

On December 10, 2018, an Independent Hearing Officer (IHO) conducted a hearing on S.R.'s amended due-process complaint, which claimed that Sylvania violated the IDEA on several grounds. In relevant part, S.R. requested that Sylvania reimburse her for the costs of LMB reading intervention for the summers of 2016–18 and for the costs of all previous and prospective reading intervention services during the academic year from 2008–19 "as recommended by C.K.'s clinicians." *Id.* at 1920. The IHO took testimony from S.R., C.K.'s grandfather, Bowers, LMB tutor Sarah Ellis, and several tutors, intervention specialists, school psychologists, and other officials who had worked with C.K. and/or been members of C.K.'s IEP team.

The IHO concluded that Sylvania had provided C.K. with a FAPE. Specifically, the IHO concluded that the IEP from the 2017–18 year "would appear to offer C.K. a reasonably calculated plan to enable him to make progress appropriate in light of his circumstances" given that there was "nothing in the IEP indicating that [S.R.] was questioning the need for [C.K.] to be educated in the District or indicating that [C.K.] required an education outside of Sylvania," particularly when the alternative placement at LMB "removes [C.K.] from four of the five stated areas of special

education provided for in the 2017 IEP." *Id.* at 1934–35.  The IHO concluded that "there is not sufficient evidence to support that LMB was necessary for C.K. to make progress," *id.* at 1938, and C.K.'s removal for LMB tutoring during fifth grade actively harmed his other IEP goals because it "plac[ed him] into a situation where [he was] not interacting with any other students during the 2 hours of tutoring," which was "violative of the least restrictive notion as to what is appropriate." *Id.* at 1939.  The IHO placed particular emphasis on two of his record findings: 1) When asked if an assessment demonstrating that C.K.'s reading success was more likely attributable to LMB tutoring than to the school's tutoring, Bowers acknowledged that no such assessment existed; and 2) LMB's program did not always result in progress; C.K. made progress during fourth grade without LMB and showed regression during the summer in which he used only LMB.  *Id.* at 1940.  The IHO additionally found that ESY was not necessary because C.K. made appropriate progress during the school year, and there was "no evidence that following time off from school that he was having trouble reacquiring those skills learned during the school year." *Id.*

Finally, the IHO made an apparent credibility determination that LMB testing and methodology suffered from reliability issues, concluding:

> Information regarding LMB was offered by its Center Manager, Sarah Ellis.  She has an undergraduate degree in education with two years of teaching before joining LMB.  LMB did not provide all of the documents that had been subpoenaed to produce.  They did not produce their lesson plans.  The "clinicians" who work directly with the students have two weeks of training with one week spent on the Seeing Stars Program and the other [on the] Visualizing and Verbalizing Program, a college education is not required by LMB for its employees.  (They are also referred to as tutors.)  LMB provides services online as well as in person.  Ms. Ellis was an online tutor for C.K. in the Summer of 2016.  In addition, LMB uses tests, which are administered by individuals who do not have the proper certifications to administer the tests being used.  (See Ellis Testimony.)  The standardized tests used by LMB were also given more often than recommended which may have an effect on the reliability of tests.  As no one testified from LMB who could state what each person's qualifications were who tested C.K., the validity of those tests is

> questionable. (See testimony of Nancy Brown, licensed school psychologist regarding the evaluation process of C.K. and how testing should be done.) The sheer amount of hours that C.K. was in LMB Seeing Stars program raises additional issues. He was originally scheduled to sit through 240 hours of tutoring in that program; however, LMB has a practice of starting the hourly count over when a new round of classes begins as well as starting the program over. The result is the child may well have completed the program multiple times.

*Id.* at 1931–32 (some internal citations omitted). The IHO additionally concluded that there was "no evidence in the record that the LMB program that CK received was individualized to him. While they may have tested him, the reliability of which may be questioned, the program itself was simply administered numerous times." *Id.* at 1938. Finally, the IHO found it significant that Bowers was surprised by what he learned about LMB while testifying, because Bowers's "understanding of the LMB program was that it was staffed by well-trained tutors. He was surprised to find the extent of their instruction as to how to administer the program."[20] R. 27, PID 1933.

### C. The State Level Review Officer's decision reversing the IHO

S.R. appealed the IHO's decision. The SLRO reversed the IHO and determined, in relevant part, that Sylvania had not provided C.K. with a FAPE and that S.R. was entitled to reimbursement for LMB private tutoring. In a lengthy decision, the SLRO concluded that "any reading progress made by C.K. at Sylvania was wholly as a result of the extensive private LMB tutoring provided by C.K.'s Parent throughout C.K.'s education at Sylvania between the second and fifth grades."

---

[20] These statements likely refer to Bowers's testimony that he tended to recommend LMB because "it's been around for over 30 years at this point," it is "research-based," "empirical[]" and "research supported," "individualized," "requires a considerable amount of training and experience to learn how to administer the Lindamood-Bell techniques," and is "flexible," which is important because "[w]e don't want to keep hammering home the exact same intervention approach once the student's already gotten it." R. 35, PID 3670. Bowers then stated on cross-examination that he would not expect a reading interventionist to repeat the same program again if the child had already mastered something, *id.* at 3766, and that he was surprised to learn that LMB tutors get only two weeks of training. *Id.* at 3772–73 (noting that learning this information would "perhaps" change his view about the program, but that there are "other factors that would need to be considered").

*Id.* at 2122–23. The SLRO ordered Sylvania to "fully REIMBURSE the Parent for the [LMB] reading programming provided to C.K in grades 2-5;" "provide prospective services and payment for any continued private reading programming required during the pendency of this litigation;" "prospectively provide appropriate intensive reading programming to fully remediate C.K.'s ongoing two-year grade level reading deficit to C.K.'s current grade level reading to allow C.K. to access his grade level educational curriculum;" and, as a part of that prospective remediation, "include tutoring as needed for substantive educational content C.K. missed as a result of his un-remediated reading deficiencies, including intensive Math supports in light of his normal, average intelligence." *Id.* at 2129. The SLRO ordered that Sylvania continue to provide "prospective reading services" until "such time that LMB testing supports a recommendation that C.K. no longer requires the intensive remedial reading interventions." *Id.* at 2130.

The SLRO stated that the "heart" of the school's failure to provide adequate reading programming was that it "first, failed to provide the Wilson Reading program with fidelity and second, failed to consider C.K.'s relevant data in decoding, phonics, and fluency to determine his critical needs for intensive reading remediat[ion] in choosing appropriate reading remediation programming." *Id.* at 2168. The SLRO concluded that the IHO "discounted Dr. Bowers and [his] two comprehensive psychoeducational evaluations," and that Sylvania impermissibly failed to "take into consideration any of the recommendations of Dr. Bowers." *Id.* at 2163–64. The SLRO additionally concluded that Sylvania erred in failing to close C.K.'s reading gap. The SLRO cited the Wilson Language Tracking Corporation website to conclude that Sylvania's reading program had failed to meet Wilson standards and had not been applied with the requisite fidelity. The SLRO concluded that Sylvania's 20-minute daily Wilson intervention was insufficient and that the district ultimately "failed to provide C.K. with a FAPE by both delivering the Wilson Reading

program below the minimum fidelity requirements and by failing to provide an appropriately designed reading program to remediate C.K.'s 2-year reading deficits."[21]   *Id.* at 2168, 71.

The SLRO also concluded that the IHO erred in finding that the LMB was unnecessary for a FAPE because C.K.'s data showed regression when he did not receive LMB programming.[22] *Id.* at 2184–85.  As support for this proposition, the SLRO pointed to the several months in fourth grade in which C.K. did not have private tutoring, when LMB testing showed that he regressed from a 3.5 grade level to a 1.8 grade level, and in second grade when he did not have LMB programming and was "unable to progress beyond his 2-year reading deficiency."  *Id.* at 2145.

In final relevant part, the SLRO reversed the IHO's determination that ESY services were unnecessary because Bowers's reports showed general memory recall issues such that "even had [Sylvania] provided C.K. with an appropriate reading program . . . C.K. would need ESY summer

---

[21] On appeal, S.R. does not challenge the fidelity, design, or other methodological aspects of Sylvania's reading programming.

[22] The SLRO addressed the IHO's findings about LMB's unreliability with the following:

> In addition, the Parent argues that the LMB testing results were reliably administered by LMB practitioners, contrary to the IHO's conclusion that the LMB testing results were unreliable because the tests were "administered by individuals who do not have the proper certifications."  Parent asserts that the LMB Center Manager verified that the LMB staff received the required "training related to test administration" as well as in the program content.  Significantly, the LMB program is intensive 1:1 instruction, thus, the success of the student on one lesson, progresses the student to the next lesson, unlike group reading lessons.  Further, Parent points out that the Sylvania School District psychologist agreed that the "norm-based" standardized testing training is the primary requirement need[ed] in order to administer [the] necessary program effectiveness.  Indeed, LMB data is also supported by Bower[s's] report I (2d grade); and, by the Psychoeducation Evaluation II (Bower[s's] Report II) (4th grade).

R. 27, PID 2179–80 (internal citations omitted).  The SLRO did not address the IHO's determinations that: LMB's methodology could not be assessed because it did not produce requested records; there was no evidence that LMB's curriculum was individualized to C.K.; LMB apparently put C.K. through the same program multiple times even when he had completed the curriculum; and, contrary to appropriate testing practice, LMB assessed C.K. more often than is recommended and used identical versions of the standardized testing forms.

programming in his critical early reading instruction to avoid significantly jeopardizing his ability to *retain* and commit to memory the essential reading building blocks." *Id.* at 2191.

### D. The district court's decision reversing the SLRO

After prevailing before the SLRO, S.R. filed a suit on C.K.'s behalf in federal district court seeking attorney fees. Shortly after, Sylvania filed suit in the same court seeking to overturn the SLRO's decision. The district court consolidated both actions and, on cross-motions for summary judgment, granted Sylvania's motion to reverse the SLRO and denied C.K.'s motion for attorney fees.

The district court refused to defer to the SLRO's decision based on numerous errors it found in the SLRO's opinion. The court concluded that Sylvania procedurally and substantively complied with the IDEA's FAPE requirement because it 1) considered the Bowers reports with which it was provided in developing the IEP; and 2) provided an IEP that was reasonably calculated to enable C.K. to make appropriate progress in light of his circumstances. *Id.* at 4200. The court also found that the "heavy dose of LMB tutoring" during the school year violated the Act's requirement for the "least restrictive [educational] environment," and that removing C.K. from mainstreamed class would damage his non-reading IEP goals. *Id.* at 4201–02. The district court additionally found it significant that Sylvania offered S.R. an option for C.K.'s fifth-grade curriculum that incorporated a less intensive and isolating version of the preferred LMB testing, but that S.R. rejected it. *Id.* at 4202.

As to ESY services, the court concluded that S.R. had not proven that C.K.'s benefits during the school year would be "significantly jeopardized" without extended programming. *Id.* at 4203. The court also found it significant that "there is some evidence LMB summer tutoring led to a regression in C.K.'s reading abilities, the only one of C.K.'s areas of need LMB could

conceivably improve," *id.*, and concluded that S.R. had failed to show that LMB services "were necessary to preserve past progress." *Id.* at 4204.

## I. STANDARD OF REVIEW

The Individuals with Disabilities Education Act, or IDEA, was enacted "to ensure that all children with disabilities have available to them a free appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Among other things, IDEA provides for a system of review and relief if parents believe that their child has been deprived of a FAPE. *See id.* § 1415. After complaining to the school district, an "aggrieved" parent may participate in a due-process hearing before an IHO of the local educational agency, which may then be appealed to the state agency. *Id.* § 1415(b)(2), (f)–(g). Any party aggrieved by the state administrative proceedings may then bring an action in federal or state court. *Id.* § 1415(i)(2)(A).

A federal district court reviews a state administrative IDEA determination under a "modified de novo" standard, which requires the court "to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings." *Somberg ex rel. Somberg v. Utica Cmty. Schs.*, 908 F.3d 162, 172 (6th Cir. 2018) (quoting *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 849–50 (6th Cir. 2004)).

On federal appellate review, we apply a clearly erroneous standard of review to the district court's factual findings and a de novo standard to legal conclusions. *Deal*, 392 F.3d at 850. "Mixed questions of law and fact, including the question of whether a child was denied a FAPE, are reviewed de novo," with the appellate court also "accord[ing] due deference to the state

administrative hearing officer's decision." *Id.* We defer to the findings of the state administrative agencies—the IHO and SLRO—and specifically to the SLRO as the "final decision" when those findings conflict. *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990).

## II. LAW AND ANALYSIS

The IDEA "requires states that receive federal funds for education to provide every disabled child who wants it a 'free and appropriate public education' (FAPE)." *L.H. v. Hamilton Cnty. Dep't of Educ.*, 900 F.3d 779, 788 (6th Cir. 2018) (quoting 20 U.S.C. § 1412(a)(1)(A)). Where, as here, "parents challenge the appropriateness of a program or placement offered to their disabled child by a school district under the IDEA," courts conduct a "twofold inquiry" that first "ask[s] whether the school district has complied with the procedures set forth in the IDEA" (procedural compliance), and second asks "whether the IEP, developed through the IDEA's procedures, is reasonably calculated to enable the child to receive educational benefits" (substantive compliance). *Knable ex rel. Knable v. Bexley City Sch. Dist*, 238 F.3d 755, 763 (6th Cir. 2001). "There is no violation of the IDEA so long as the school district has satisfied both requirements." *Id.*

If the Act's procedural requirements "are met, greater deference is to be afforded to the district's placement decision." *Burilovich v. Bd. of Educ. of Lincoln Consol. Schs.*, 208 F.3d 560, 566 (6th Cir. 2000) (quoting *Dong v. Bd. of Educ. of Rochester Cmty. Schs.*, 197 F.3d 793, 800 (6th Cir. 1999)). Because C.K. is "challenging the terms of [his] IEP," it is his "burden [to] prov[e] that the placement was not appropriate." *Dong*, 197 F.3d at 799.

### A. Whether Sylvania procedurally violated the IDEA

Failure to comply with the procedural requirements of the Act "will constitute a denial of FAPE only if such violation causes substantive harm to the child or his parents," which "occurs

when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process." *Knable*, 238 F.3d at 765–66 (internal citations omitted).

S.R. did not assert a procedural violation of the IDEA in state proceedings, and the IHO accordingly did not address this issue. However, the SLRO determined sua sponte that Sylvania "fail[ed] to consider [C.K.'s] private psychoeducational evaluations"—specifically, Bowers's 2016 and 2018 psychological reports. R. 27, PID 2162–64. The SLRO concluded that this failure violated Sylvania's obligation to "consider parent-initiated evaluations in 'any decision made with respect to the provision of FAPE to the child.'" *Id.* at 2162 (quoting 34 C.F.R. § 300.502(c)(1)). The district court reversed this determination, finding to the contrary that Sylvania "considered Dr. Bowers's 2018 report and incorporated it into C.K.'s IEP," and "S.R. did not share the 2016 report with the district." R. 46, PID 4194–95.

The relevant IDEA regulations provide:

> If the parent obtains an independent educational evaluation at public expense or shares with the public agency an evaluation obtained at private expense, the results of the evaluation . . . must be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child.

34 C.F.R. § 300.502(c)(1). The regulations do not require that the agency adopt the recommendations in the independent evaluation, and we have not expounded on what it means for a district to "consider" an independent evaluation. *But see Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 753–54 (2d Cir. 2018) (noting that there is no regulatory requirement that a school district implement, or even "substantive[ly] discuss[]," an independent evaluation, and concluding that an independent evaluation "was adequately 'considered'" when the school representative "reviewed the independent educational evaluation (IEE), attended the PPT [planning and placement team] meeting, and commented on the IEE during the PPT meeting").

On appeal, S.R. argues that she provided Sylvania with Bowers's 2016 report, which Sylvania then failed to consider; and although Sylvania incorporated portions of Bowers's 2018 report in its October 2018 IEP, Sylvania failed to fully "consider" it because "[t]he incorporated recommendations pertained only to classroom modifications."[23] Appellant's Br. at 22.

As to the first argument, while it is not clear from the record that S.R. actually provided the school with a physical copy of Bowers's report, C.K.'s March 2016 IEP Team Meeting description nevertheless summarizes, in detail, what appears to be S.R.'s oral report of both a private pediatric evaluation and Bowers's 2016 report and recommendation, including his recommendation that C.K. be "referred . . . to the Birmingham Learning Center in Ann Arbor [where LMB is located] for further assessment in the area of reading," the results of which recommended "12 weeks of intensive programming that consists of 4 hours of daily instruction, 5 days per week, in a 1:1 setting using the Lindamood-Bell program." R. 30, PID 3001. It thus appears that Sylvania considered the recommendations and information provided in Bowers's 2016 report.[24]

As to the 2018 Report, S.R. notes that the 2018 IEP "made no mention of Dr. Bowers's recommendation for intensive reading interventions." Appellant's Br. at 22–23. However, S.R. acknowledges that she provided the Report in its entirety to Sylvania, and that Sylvania "incorporated [Bowers's] recommendations pertain[ing] to classroom modifications," Appellant's

---

[23] S.R. also makes a new argument on appeal: that Sylvania impermissibly "predetermine[d] the content of [C.K.'s] IEP and d[id] so before the process of preparing the IEP [had] begun." Appellant's Br. at 24. But we do "not consider arguments raised for the first time on appeal unless the party shows that refusal to consider the argument would result in a miscarriage of justice." *Perez v. Oakland County*, 466 F.3d 416, 430 (6th Cir. 2006). S.R. does not argue that failure to consider this new argument would result in a miscarriage of justice.

[24] S.R. was not asking that Sylvania pay for or incorporate private LMB tutoring when she provided this report in 2016.

Br. at 22. It is additionally undisputed that C.K.'s October 2018 IEP reflects consideration of Bowers's 2018 report. R. 30, PID 3176 ("Recommendations made by Dr. Bower[s] . . . were shared with the district via email on 8/20/18. District team members reviewed these recommendations to determine which accommodations/modifications are already being provided as well as any additional accommodations that may be needed to help [C.K.] access the curriculum."). C.K.'s IEP did include intensive reading recommendations, but not to the extent recommended by Bowers. *See Mr. P*, 885 F.3d at 754. S.R. does not explain why Sylvania's failure to *adopt* Bowers's recommendations constitutes a failure to *consider* those recommendations, and there is no basis in the regulatory language for so finding. *See* 34 C.F.R. § 300.502(c)(1); *Mr. P*, 885 F.3d at 754.

Additionally, a procedural error does not violate the Act unless it causes "substantive harm to the child or his parents," which "occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process." *Knable*, 238 F.3d at 765. S.R. does not argue that the alleged procedural error here seriously infringed on S.R.'s ability to participate in the IEP process. To the contrary, the record reflects that S.R. actively participated in the IEP process.

## B. Whether Sylvania substantively violated the IDEA

S.R. next argues that Sylvania violated the substantive requirements of the Act by denying C.K. a FAPE, which should have included intensive LMB programming. The Act requires that states make available "[a] free appropriate public education . . . to all children with disabilities residing in the State between the ages of 3 and 21." § 1412(a)(1)(A). The Supreme Court has clarified the standard for determining whether a school district's IEP provides FAPE:

> To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.
>
> The 'reasonably calculated' qualification reflects a recognition that crafting an appropriate program of education requires a prospective judgment by school officials. The Act contemplates that this fact-intensive exercise will be informed not only by the expertise of school officials, but also by the input of the child's parents or guardians. Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal.

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017) (some citations omitted).

In articulating this standard, the Supreme Court rejected the two polarized definitions of "appropriate progress" proposed by the parties before it—the school district's proposed standard of "merely more than *de minimis*" and the parents' proposal requiring schools to "provide a child with a disability opportunities to achieve academic success, attain self-sufficiency, and contribute to society that are substantially equal to the opportunities afforded children without disabilities"— and instead expressly declined to "elaborate on what 'appropriate' progress will look like from case to case. It is in the nature of the Act and the standard we adopt to resist such an effort: The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Id.* at 1001.

In analyzing the FAPE requirement here, the district court determined that S.R. failed to show that Sylvania's 2017–18 IEP was not "reasonably calculated to enable [C.K.] to make progress appropriate in light of [his] circumstances." R. 46, PID 4202–03 (quoting *Endrew F.*, 137 S. Ct. at 999).

S.R. challenges multiple aspects of the court's opinion.

**1. Whether the district court erred by deferring to the IHO's findings and conclusions and declining to defer to the SLRO**

In reviewing actions brought under the IDEA, federal courts are required to defer to the findings of school officials and state education officers "on matters of substantive educational methodology" when "the finding is based on educational expertise." *L.H.*, 900 F.3d at 790. This is because "[a] reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions." *Endrew F.*, 137 S. Ct. at 1002. Courts award additional deference to the school district's substantive IEP determinations when the district procedurally complied with the IDEA.[25] *Dong*, 197 F.3d at 800. "A court should defer to the administrative findings only when educational experience is relevant to those findings and the decision is reasonable." *Burilovich.*, 208 F.3d at 567. "[A]dministrative findings in an IDEA case may be set aside only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *Id.*

Where a state has established a two-tier review process—as Ohio has—with an evidentiary hearing before an IHO, followed by SLRO review, "federal courts are required to defer to the final

---

[25] The district court noted in a footnote that, while *Dong* has long stood for the proposition that "districts that comply with the procedural requirements of the Act are entitled to deference in their substantive decision," *Dong* has once, in *L.H. v. Hamilton County Department of Education*, been cited to suggest that "the district's procedural compliance required the court to defer to the administrative officer's findings of fact." R. 46, PID 4196 (first citing several *Dong* cases, then *L.H.*, 900 F.3d at 790 ("If the procedural requirements are satisfied, the court grants greater deference to the *State ALJ's* determinations on the second step, the substantive analysis") (citing *Dong*) (emphasis added by district court).

The district court declined to follow *L.H.*'s interpretation of *Dong* because *L.H.* "offered no explanation for this variation, . . . [and] the Court does not understand how a district's procedural compliance entitles the hearing officers to deference, as they do not develop the IEP itself." *Id.*

We agree that *L.H.*'s interpretation of *Dong* is incorrect. Its holding on this point is an aberration in the caselaw, *see* R. 36, PID 4196 (citing cases), and it does not make sense to give greater deference to a state administrative judge's substantive assessment on the basis of the *district's* procedural compliance with the statute.

decision of the state authorities," the SLRO. *Thomas*, 918 F.2d at 624. This deference, or "due weight" to the administrative proceedings, "will vary, depending on whether the court is reviewing procedural or substantive matters and whether educational expertise is essential to the administrative findings." *Burilovich*, 208 F.3d at 566. While a court may not "substitute [its] own notions of sound education policy for those of the school authorities which [it] review[s]," neither may it "simply adopt the state administrative findings without an independent re-examination of the evidence." *Deal*, 392 F.3d at 849 (internal quotations omitted).

The district court explained that it declined to defer to the SLRO because state hearing officers are "expected to possess both educational and legal expertise to assess an IEP's compliance with the substantive requirements of the Act," but in this case, "the SLRO does not display the requisite expertise." R. 46, PID 4196 (quoting *Deal*, 392 F.3d at 865). The court cited what it perceived to be multiple errors in the SLRO opinion, including its: sua-sponte determination incorrectly finding that Sylvania had ignored the Bowers reports; chastisement of the IHO for ignoring what the SLRO stated was binding Supreme Court guidance from *Endrew F.* that the "IDEA[] expect[s] . . . grade-level advancement," when that language actually came from an amicus brief in the Third Circuit; misstatement of the Sixth Circuit's LRE requirement; application of Fourth Circuit law to the ESY determination; and issuance of a final order that the district court believed to be unenforceable, specifically, requiring Sylvania to "close [C.K.'s reading] gap." *See id.* at 4195–203. The district court concluded that, because of these "bizarre and concerning" errors, the SLRO's "opinions are not entitled to any deference." *Id.* at 4196, 4199.

On appeal, S.R. argues that the district court erred in denying deference to the SLRO because the SLRO's opinion's erroneously cited language, though "sloppy," was "not inconsistent

with *Endrew F.*;" there was no "pattern of erroneously cited language;" and the SLRO's factual findings "evidenced enormous educational expertise" which the district court "did not question." Appellant's Br. at 32–33. S.R. also argues that the district court erred in awarding deference to the IHO because the IHO also misstated *Endrew F.* Appellant's Br. at 28. We disagree.

a. The SLRO's legal errors

First, the IHO properly applied *Endrew F.* Although the IHO began his opinion with the statement that "argument[s] over potential of the student could result in a discussion of an 'entirely unworkable standard,'" R. 27, PID 1933 (quoting *Endrew F.*, 137 S. Ct. at 1001), which is an incorrect characterization of *Endrew F.*'s "entirely unworkable standard" language,[26] the IHO stated and applied the proper *Endrew F.* standard when analyzing S.R.'s argument: "The IEP from 2017 would appear to offer C.K. a reasonably calculated plan to enable him to make progress appropriate in light of . . . his circumstances." R. 27, PID 1934; *cf. Endrew F.*, 137 S. Ct. at 999.

Second, S.R. is incorrect that the SLRO's legal errors were neither pervasive nor inconsistent with *Endrew F.* The SLRO made it clear throughout her opinion that she was evaluating Sylvania's IEP with an eye toward whether it was reasonably calculated to help C.K. "close" his reading "gap" and achieve "grade level advancement." *See, e.g.*, R. 27, PID 2129. However, *Endrew F.* discourages outcome-driven standards generally, and specifically warns that grade-level advancement may not be an appropriate goal for all children. *See* 137 S. Ct. at 1000 (noting that while "[f]or most children, a FAPE will involve integration into the regular classroom and individualized special education calculated to achieve advancement from grade to grade," if it "is not a reasonable prospect for a child" to "progress[] smoothly through the regular curriculum,"

---

[26] The "entirely unworkable standard" language referred not to arguments over a student's potential, but to an argument that the IDEA requires states to guarantee "equal educational opportunities" to disabled students. *Endrew F.*, 137 S. Ct. at 1001 (internal citation omitted).

then "his IEP need not aim for grade-level advancement," but must be "appropriately ambitious in light of his circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom"). The SLRO then compounded her improper interpretation of *Endrew F.* by ordering Sylvania to provide C.K. a final educational outcome: that the school "fully remediate C.K.'s ongoing two-year grade level reading deficit." R. 27, PID 2130. Applying *Endrew F.*, the district court correctly rejected this order and the legal analysis that supported it. 137 S. Ct. at 989 ("[T]he statement that the Act did not 'guarantee any particular level of education' simply reflects the unobjectionable proposition that the IDEA cannot and does not promise 'any particular [educational] outcome.'") (quoting *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist.v. Rowley*, 458 U.S. 176, 192 (1982)).

These were not the SLRO's only legal errors. In her discussion of C.K.'s eligibility for ESY, the SLRO applied a Fourth Circuit "window of opportunity" test that asks "whether the level of services provided in the summer programming are adequate to prevent the gains from the school year from being significantly jeopardized without ESY services." R. 27, PID 2189 (quoting *J.H. ex rel. J.D. v. Henrico Cnty. Sch. Bd.*, 326 F.3d 560, 567–69 (4th Cir. 2003)). The Sixth Circuit test for ESY services is stricter, however, and requires a claimant to prove "that an ESY is necessary to avoid regression so severe that the child would not be able to catch up during the following school year." *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 314–15 (6th Cir. 2007). Additionally, the SLRO misstated the Sixth Circuit's LRE test. Under our caselaw, "a school may separate a disabled student from the regular class" when "any regular-class benefits would be *far outweighed* by the benefits of special education." *L.H.*, 900 F.3d at 789 (emphasis added). However, the SLRO reversed this priority, stating that "[t]he mainstreaming preference to educate in the least restrictive environment must be secondary to the educational benefits of

learning to read and write." R. 27, PID 2181. Additionally, although our caselaw is clear that "[t]he LRE is a *non-academic* restriction or control on the IEP . . . that concerns whether, or the extent to which, a disabled student can be mainstreamed rather than segregated," *L.H.*, 900 F.3d at 789, the SLRO improperly characterized the LRE as a purely academic restriction: "whether C.K.'s appropriate reading instruction was in the classroom, or inside the school building down the hall, or in another building down the street from the [s]chool, C.K.'s appropriate placement in the LRE is not defeated because the LRE is the educational program, not the location." R. 27, PID 2205.

Applying *Burilovich*, we conclude that the district court did not err in declining to defer to the SLRO's legal conclusions on the grounds that her decision applied incorrect law to the *Endrew F.*, ESY, and LRE standards, and ordered an unenforceable educational outcome. "A court should defer to the administrative findings only when educational experience is relevant to those findings and the decision is reasonable." *Burilovich*, 208 F.3d at 567. The SLRO's legal conclusions were not reasonable.

b. The SLRO's factual findings

The SLRO's factual findings are more complicated. Although the district court adequately explained why it would not award the SLRO's legal conclusions any deference, it did not clearly explain why it failed to defer to the SLRO's factual findings. Relevant to the appeal, these findings were: that "any reading progress made by C.K. at Sylvania was wholly as a result of the extensive private LMB tutoring provided by C.K.'s Parent throughout C.K.'s education at Sylvania between the second and fifth grades" and that C.K. showed regression during the school year sufficient to warrant ESY. R. 27, PID 2122–23, 67–68, 91. Because these factual findings are presumably

based on the SLRO's educational expertise, they would normally be entitled to deference absent evidence that these findings were unreasonable. *Burilovich*, 208 F.3d at 567.

We conclude, however, that the district court's failure to defer to the SLRO's factual findings was not error under the modified de novo standard applicable here. Under this standard, a district court must still "independently reexamin[e] the evidence for itself" and may not "simply adopt the state administrative findings." *Somberg*, 908 F.3d at 173 (holding that it was harmless error for a district court to award "considerably less deference" to a bare-bones ALJ decision when the district court "evaluat[ed] the preponderance of the evidence in the record" and "later conducted a bench trial on this very issue"). In this case, while the district court did not conduct a bench trial, it meticulously summarized the evidence in this lengthy record, summarized the two competing administrative decisions, and clearly explained its own factual findings and legal conclusions.

Under a more deferential standard, the district court's failure to explain its refusal to defer to the SLRO's version of the facts might have been error. But "administrative findings in IDEA cases should be afforded less deference than that given to agencies under the substantial evidence test, and in view of the IDEA's preponderance of the evidence standard, . . . [a] court should defer to the administrative findings only when educational expertise is relevant to those findings and the decision is reasonable." *Burilovich*, 208 F.3d at 567. Further, we have our own concerns with the SLRO's explanations for her factual findings that cause us to question the reasonableness of her recitation of the facts. For example, the SLRO sua-sponte determined that Sylvania "fail[ed] to consider [C.K.'s] private psychoeducational evaluations," when neither party had advanced this argument and there was clear record evidence to the contrary, *see supra* Section III.A.1. Additionally, relying heavily on LMB testing data, the SLRO determined that "any reading

progress made by C.K. at Sylvania was wholly as a result of the extensive private LMB tutoring provided by C.K.'s Parent throughout C.K.'s education at Sylvania between the second and fifth grades," R. 27, PID 2122–23, notwithstanding that Bowers—C.K.'s expert—admitted that no assessment existed to determine whether C.K.'s reading success was more attributable to LMB tutoring than school tutoring, let alone that it was exclusively due to the former, and that the record as a whole showed mixed, rather than absolute, data on that issue. Nor did the SLRO address most of the IHO's substantial credibility concerns with LMB's methodology. Further, although the SLRO's role as a factfinder is distinct from her role as a legal arbiter, the district court's wariness in deferring to the SLRO generally is understandable given the magnitude and extent of her numerous legal errors.

In short, while it would have been preferable for the district court to more clearly address the SLRO's version of the facts, the court's failure to do so was not reversible error under the modified de novo standard applicable here, given its thorough examination of the record and clear explanation for its factual findings and legal conclusions. In our own de novo review of this case, we address the SLRO's version of the facts where applicable.

**2. Whether Sylvania's 2017–18 IEP provided C.K. with FAPE**

S.R. argues that Sylvania failed to provide C.K. with an IEP that was "reasonably calculated to enable [him] to make appropriate progress in light of [his] circumstances." Appellant's Br. at 25 (quoting *Endrew F.*, 137 S. Ct. at 997). Specifically, S.R. argues that the district court erred in reversing the SLRO's determination that Sylvania "failed to provide educational services that would provide C.K. with the opportunity to develop grade level reading skills that he had repeatedly shown himself capable of achieving." *Id.* at 27–28. S.R. asserts numerous errors in the district court's reasoning, including that the court erred by 1) refusing to

consider C.K.'s potential to achieve grade-level advancement and LMB's role in facilitating it; and 2) determining that participating in LMB negatively impacted his other IEP goals.

### a. The *Endrew F.* standard

In *Endrew F.*, the Supreme Court explicitly declined to "elaborate on what 'appropriate' progress will look like from case to case," explaining that an IEP's adequacy "turns on the unique circumstances of the child for whom it was created." 137 S. Ct. at 1001. The Court warned that the "absence of a bright-line rule, however, should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* (quoting *Rowley*, 458 U.S. at 206).

*Endrew F.* is a relatively recent case, and we have only applied the new "appropriate progress" standard twice, in *L.H.*, 900 F.3d at 796–97 and *Barney v. Akron Bd. of Educ.*, 763 F. App'x 528, 533 (6th Cir. 2019).

*L.H.* involved a child with Down Syndrome whose school district attempted to place him in a completely segregated special-education classroom, which L.H.'s parents worried would harmfully isolate him from his friends and peers. *Id.* at 786. After L.H.'s parents unilaterally placed him into a mainstreamed, private Montessori school and then sought reimbursement from the public school district, HDCE, the district court determined that the Montessori placement was inappropriate under the IDEA. In reversing and finding that the Montessori placement satisfied the *Endrew F.* standard, we held:

> Whether or not the Montessori approach is as "structured" in its own way as the public school approach . . . is in its way, the record is clear that L.H. had a personalized curriculum at [Montessori] and a paraprofessional aide dedicated just to him, such that he was working at his own pace with frequent repetition, intense one-on-one instruction, and repeated prompting and reinforcement. The district court relied on HCDE's claims that the Montessori approach fails to provide this ambiguous "systematic structure"; those claims appear both overblown and unreliable. In fact, the parents' expert, Dr. Whitbread, testified that the Montessori

approach is a "curriculum that is well-suited for children with Down syndrome in many respects," and good for L.H. in particular.

900 F.3d at 797 (some internal citations omitted).

In *Barney*, which involved a parent's claim that the school district's IEP did not meet the *Endrew F.* standard because it was neither sufficiently "ambitious," nor sufficiently tailored to the child, we held:

> Barney first takes issue with J.B.'s program, which (she says) was not sufficiently "ambitious" or specific. Contrary to Barney's assertion, however, the program contained goals tailored to J.B.'s weaknesses in five categories: speech, fine motor skills, reading, writing, and math. Each goal included detailed academic objectives. Moreover, the program specified how much time should be spent weekly on each goal and provided for regular reporting of J.B.'s progress to his parents. Barney therefore has not shown why the program was not "reasonably calculated" to enable J.B. to make "progress appropriate in light of [his] circumstances."
>
> Barney also argues that the school district should have revised J.B.'s plan mid-year because J.B. was not meeting his goals. But the Act guarantees access to education—not that a student will achieve a particular outcome. *See Bd. of Educ. of Hendrick. Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982). And Barney offers no evidence that J.B.'s progress was so deficient that the school district should have revised his goals in the middle of the school year. Hence this argument is without merit.

763 F. App'x at 533.

**b. Application to C.K.**

The crux of S.R.'s argument is that the reading goals in Sylvania's IEP were not appropriately ambitious in light of C.K.'s potential, and that Sylvania was obligated to provide him "with the opportunity to develop grade level reading skills that he had repeatedly shown himself capable of achieving." Appellant's Br. at 27–28. S.R. analogizes this case to that of the child in *Woods v. Northport Public School*, in which we determined that a school district failed to provide FAPE when it "failed to implement certain important aspects of [the child's] IEP," including time with two autism specialists, which together constituted "a significant aspect of [the

child]'s second-grade IEP." 487 F. App'x 968, 975 (6th Cir. 2012). We rejected the school district's argument that it had nonetheless provided FAPE because, despite the lack of services, the child "did make some progress during his second-grade year." *Id.* at 975. We stated that, although the child had made "progress," that "progress was not *meaningful* in light of [the child]'s potential . . . ; [given] appropriate services, [he] could make significant gains in reading, writing, and mathematics." *Id.* at 975–76 (citation omitted) (cleaned up).

S.R. argues that, much like the child in *Woods*, the services Sylvania provided to C.K. were not appropriate in light of his potential, which was "achieving grade level skills in literacy . . . when he received intensive LMB interventions independently provided by S.R." Appellant's Br. at 36–37 ("In the absence of LMB interventions, C.K. was not learning how to read. And when provided with LMB interventions, he showed the ability to achieve at grade level.").

In response, Sylvania argues that 1) *Woods*—an unpublished, pre-*Endrew F.* case—was about an inappropriate reduction in services, whereas this case is about "whether the services provided in C.K.'s IEP, though not preferred by S.R., provided C.K. with a FAPE"; and 2) that C.K.'s IEP was "reasonably calculated" to progress his reading ability, which it did both with and without LMB services. Appellee's Br. at 39–40.

We conclude that C.K.'s 2017–18 IEP—which was developed in consultation with S.R. after taking into consideration all of C.K.'s applicable educational and psychological testing and which, at the time, received S.R.'s strong endorsement—was "reasonably calculated to enable [C.K.] to make progress appropriate in light of [his] circumstances." *Endrew F.*, 137 S. Ct. at 999. First, Sylvania's procedural compliance with the IDEA entitles it to deference on its substantive IEP determinations, including whether the IEP was reasonably calculated to C.K.'s specific needs. *Dong*, 197 F.3d at 800. The IEP itself, a 24-page document that S.R. helped develop and

subsequently approved, thoroughly documents C.K.'s years-long progress in the area of reading (along with his four other areas of identified need) and reflects careful consideration of C.K.'s progress, prior test scores, and educational/psychological evaluations. C.K.'s IEP was thoughtful, thorough, contained input from a wide range of sources, and was tailored to his needs as understood by all parties at the time.

Second, by multiple objective and anecdotal benchmarks, the 2017–18 IEP resulted in significant progress in C.K.'s reading ability. As C.K.'s "summary of progress" notes reflect, C.K. had, as of November 2017, "mastered" all of his prior reading decoding goals and objectives. *See* R. 30, PID 3062. Anecdotally, C.K.'s teachers reported that he was doing well in the Wilson reading program, *id.* at 3056, and S.R. noted in a series of October and November 2017 emails that C.K. is "finally making progress with generalization and retention of his reading skills" and, based on C.K.'s progress, she believed the IEP team to be "data driven" and "best practice influenced." R. 29, PID 2735, 2738. Additionally, C.K.'s STAR score had increased from 152 in August 2017 to 234 in November 2017, R. 30, PID 3060–61, all after S.R. had decided to suspend C.K.'s LMB programming.[27]

---

[27] S.R. repeatedly made it clear that her personal goal was to get C.K.'s reading to grade level, and S.R. argues that LMB testing demonstrates that this goal "was not only a reasonable prospect but clearly demonstrated to be achievable with appropriate interventions." Appellant's Br. at 36. But the evidence is mixed, and the weight of it suggests that grade-level advancement was not a reasonable reading goal for C.K. at that time. First, C.K. came to Sylvania in second grade already two full grade levels behind in reading, at the status of "nonreading." At least one education professional who evaluated and worked closely with C.K. during this time, Garrett, testified that she did not expect C.K. to read at grade level. *See, e.g.*, R. 35, PID 3797. The primary source of evidence that C.K. *was* capable of reading at grade level came from LMB's testing, but the IHO noted significant methodological flaws with LMB's testing protocol, and Positano testified that LMB's testing results were unsupported by what Sylvania officials observed in the classroom. *See, e.g.*, R. 36, PID 3898 (noting that while Sylvania's testing estimated C.K. (a fifth grader at the time of the hearing) at "between a third and fourth grade reading level," LMB testing was simultaneously "recording that he's reading fifth and sixth grade passages in working with them," but Positano "d[id not] see th[at] impact in the classroom," and "[t]he teachers [wer]en't reporting it"). The substantial weight of the non-LMB testing evidence showed that C.K. was making reading progress, but

There is some evidence that C.K. did not progress under his 2017–18 IEP beginning in 2018. S.R. anecdotally reported in early 2018 that C.K. was beginning to regress during his tutoring at home and was confusing certain numbers. C.K.'s LMB test scores from March 2018, after S.R. hired a private tutor to provide after-school LMB and Moby-Max tutoring, suggested that his word attack, oral reading, paragraph reading, and word-accuracy Woodcock, and Slosson scores had decreased from August 2017. And his May 2018 Ohio reading test results stated that his reading level had fallen from "accelerated" to "limited." But even if there were not also evidence of progress in the record,[28] this evidence of regression alone would not mean that the

that he was consistently progressing at approximately one to two grade levels behind his peers. R. 34, PID 2512 (in second grade, C.K. was reading at about a kindergarten to first-grade ability); R. 42, PID 4114 (in third grade, C.K. was reading at a beginner-to-middle first-grade level); R. 30, PID 3062 (in fourth grade, C.K. was reading at the mid-second grade level); R. 36, PID 3898 (in fifth grade, C.K. was reading between a third and a fourth-grade level).

[28] The evidence of regression is, itself, mixed. School officials told S.R. that they, too, had observed C.K. mixing up his letters and numbers, but that this "is usually as a result of him attempting to work too quickly, because when he is prompted to slow down his accuracy significantly increases." R. 30, PID 3083. The LMB data showed regression in the reading areas as noted above, but also suggested that, from August 2017 to May 2018, C.K.'s spelling scores had increased, his Gray Oral Reading Test rate had increased, his comprehension increased, and his fluency remained constant. While C.K.'s Ohio reading test did show a dramatic decrease, from "accelerated" in Spring 2017 to "limited" in May 2018, he received this test result one month after receiving his highest STAR reading assessment score all year, which moved him out of the "red-urgent intervention" category to "yellow-intervention."

This stark difference in C.K.'s performance on two school-administered standardized tests, administered one month apart, supports the educational professionals' testimony that test scores are "snapshots" that can be influenced by multiple factors and do not necessarily reflect the "overall picture of a child's ability to read." Multiple educational professionals testified that tests are an imperfect mechanism for assessing a child's ability to read, particularly if that child suffers from cognitive issues, as does C.K. *See* R. 35, PID 3787 (Nancy Brown noting that assessments and test results offer "a very narrow view of the child," and "norm-referenced assessments" are particularly difficult for children with autism or ADHD because they cannot be adapted to different communicative needs, whereas "curriculum-based measurement[s]," "observations," and parent/teacher interviews provide "a much more well-rounded picture of the child and their skills"); R. 36, PID 3898 (Positano noting that standardized assessments "give you a snapshot . . . but there's a lot of factors that can impact performance on that day," which is why school officials use a "variety of data sources" to determine reading progress). Even Bowers and S.R. acknowledged that test scores are not the sole metric for measuring a child's reading progress. R. 35, PID 3761 (Bowers agreeing that assessments and tests are "snapshot[s]" of performance that "can [] be influenced by outside factors"); R. 34, PID 3668 (S.R. acknowledging that one test does not reflect the overall picture of a child's ability to read).

IEP was not "reasonably calculated" to enable C.K. to make appropriate progress, particularly in light of the IEP's tailored crafting to his needs. *See Barney*, 763 F. App'x at 553; *L.H.*, 900 F.3d at 797.

S.R. next points to the SLRO's finding that, to the extent C.K. did make reading progress under his IEPs, that progress was due almost exclusively to LMB. But the evidence in the record is mixed. First, C.K. made significant progress on his IEP goals at times when he did not have LMB, *see, e.g.*, R. 30, PID 3060–61 (STAR score increasing from a 152 in August 2017 to a 234 in November 2017, when C.K. was receiving only school interventions and no LMB or other private instruction at home), and when he received only intensive LMB during the summer of 2017, his reading scores largely declined or remained the same. And Bowers testified that there was no assessment that could determine whether C.K.'s successes were attributable to Sylvania interventions or LMB interventions when he was receiving both at the same time.[29]

S.R. next argues that the district court erred in determining that C.K.'s participation in the intensive LMB reading program "actively harmed" his remaining IEP goals in social communication and executive functioning and that it was harmful to remove C.K. from the mainstreamed math curriculum for the first ninety minutes of each day. S.R. argues that C.K.'s social-communication and executive-functioning goals were removed three months after he began

---

[29] This issue is quite complicated. We are mindful that we may not "substitute [our] own notions of sound educational policy for those of the school authorities [we] review," *Deal*, 392 F.3d at 849, and that we must defer to the findings of school officials and state education officers because their findings are presumably based on the "educational expertise" that we lack. *L.H.*, 900 F.3d at 790. We are not equipped to pit an avalanche of test scores against one another and cherry-pick the scores that most significantly show progress or regression. But in this case, almost all of the experts—the IHO and the school officials, as well as C.K.'s medical expert Bowers—agree that it is unlikely that C.K.'s progress is primarily (let alone solely) attributable to LMB. Only the SLRO disagrees, and does so while discounting a significant amount of evidence that contradicts or undermines her conclusions or the credibility of her sources. Accordingly, we conclude that the weight of the record and authority supports the IHO and district court's finding that C.K.'s progress is not attributable to LMB alone. *Burilovich*, 208 F.3d at 567.

intensive LMB tutoring during fifth grade, in November 2018, and that "[t]he record lacks evidence even remotely suggesting that C.K.'s progress in achieving any IEP goal was compromised by his absence from math class or involvement in LMB interventions." Appellant's Br. at 38.

The Supreme Court has stated that the IDEA left "the primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs . . . to state and local educational agencies in cooperation with the parents." *Rowley*, 458 U.S. at 207. We conclude that, in rejecting the intensive LMB programming as proposed by C.K.'s parents, Sylvania appropriately balanced C.K.'s then-five IEP goals of reading decoding, written expression, executive functioning, social communication, and self-regulation along with its obligation to provide C.K. with an overall education, which included a reasonable desire for C.K. to attend a mainstreamed math class. The district court appropriately deferred to Sylvania's attempted balancing of the IEP goals in light of its "primary responsibility for formulating the education to be accorded a handicapped child."[30] *Rowley*, 458 U.S. at 207.

---

[30] S.R. also argues that "the benefits of gaining and maintaining literacy far outweighed any mainstreaming interest in attending a math class in which C.K. had already tested ahead of most of his class." Appellant's Br. at 39. But this argument begins from several flawed or unsupported premises: that the intensive LMB tutoring was the only way for C.K. to achieve those goals (it was not, *see supra* Section III.B.2); that LMB tutoring and math instruction were mutually exclusive (they were not; the school offered an alternative plan in which C.K. would receive both math and LMB instruction; and that C.K.'s natural affinity toward math rendered math instruction less important than reading instruction (C.K. does not provide support for this premise, and a judgment like this, when the school felt strongly to the contrary, impermissibly "substitutes [one's] own notions of sound educational policy for those of the school authorities" charged with "formulating the education to be accorded a handicapped child" (first *Deal*, 392 F.3d at 849, then *Rowley*, 458 U.S. at 207)). While we are sympathetic to S.R.'s argument that C.K.'s reading needs should have been prioritized, we are not in a position to say, on this record, that C.K. did not need to attend math class.

Accordingly, we conclude that S.R. has failed to show that C.K.'s 2017–18 IEP denied him a FAPE. For this reason, it is unnecessary to address the district court's determination that the desired LMB placement violated the Act's least-restrictive environment (LRE) requirement.

**B. Whether S.R. was entitled to ESY services**

S.R. next argues that the district court erred in finding that C.K. was not entitled to ESY during the summers of 2016 through 2018. We have explained the ESY standard as follows:

> This court has held that the burden is on the claimant proposing an ESY to demonstrate, in a particularized manner relating to the individual child, that an ESY is necessary to avoid regression so severe that the child would not be able to catch up during the following school year. [*Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990)]. "If the child benefits meaningfully within his potential from instruction under a proper IEP over a regular school year, then ESY service may not be required under the Act unless the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an ESY." *Id.* (brackets and quotation marks omitted). A claimant must show, in other words, that "an ESY is necessary to permit the child to benefit from his instruction." *See id.* (brackets and quotation marks omitted). Claimants can rely on expert opinion testimony to make this showing and are not required to present empirical proof of actual prior regression. *Id.* at 1471–72.

*L.M.*, 478 F.3d at 315. The district court concluded that S.R. had not satisfied this standard because C.K. had not demonstrated regression sufficient to justify extended summer services, and, further, LMB services would not have been appropriate ESY services in any case because "there is some evidence LMB summer tutoring led to a regression in C.K.'s reading abilities, the only one of C.K.'s areas of need LMB could conceivably improve." R. 46, PID 4203.

On appeal, S.R. argues that the evidence shows C.K.'s "ability to retain [his] skills was fragile, owing to memory and processing deficits associated with his disabilities" and that there was "acute time sensitivity associated with C.K.'s need to achieve *and retain* grade level reading skills in light of his advancing age and grade level." Appellant's Br. at 49, 51. S.R. also cites "collapse" of C.K.'s reading skills, as measured by the Spring 2018 Ohio reading test and Spring

2018 LMB testing, as evidence of this. *Id.* at 50. S.R. also cites the SLRO's opinion that C.K.'s working-memory issues would justify ESY even if Sylvania had provided him with FAPE. *Id.* at 50.

S.R. has not met her burden to demonstrate that intensive LMB ESY services were "necessary for the provision of FAPE" from 2016 through 2018. *L.M.*, 478 F.3d at 314. First, the 2016 claim is time-barred.[31] As to 2017, C.K. began the school year showing strong gains and his entire IEP team—including S.R.—determined at the time that C.K. was making progress, that there was no evidence of regression, and that C.K. did not qualify for summer services.

As to 2018, the evidence of C.K.'s "collapse" in the Spring of 2018 is qualified and mixed with evidence of significant progress, as previously addressed, *see supra* Section III.B.2. And while the IEP team was aware of Bowers's assessment that C.K.'s working memory was fragile, Sylvania closely monitored C.K.'s 2018 progress based on data gathered "every nine weeks as well as . . . before and after extended breaks from school." R. 30, PID 3086. The overall data did not show regression during school breaks—let alone regression "so severe that the child would not

---

[31] The IDEA requires that parents request a due-process hearing "within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or if the State has an explicit time limitation for requesting such a hearing under the subchapter, in such time as the State law allows." 20 U.S.C. § 1415(f)(3)(C). Ohio applies the same two-year statute of limitations. R.C. 3323.05(G)(1)(c).

S.R. amended her due-process complaint on September 10, 2018, to include the claim for LMB ESY services during the summer of 2016. But more than two years earlier, on May 5, 2016, S.R. signed a waiver and release stating that she had "selected for [C.K.] to participate in a twelve-week program at Lindamood-Bell Learning Processes ('Program') at [her] expense. . . . The Parents affirm they alone selected the Program, it was not determined by the District to be Student's least restrictive environment, and was not the placement determined appropriate by the IEP team . . . by signing this Agreement, the Parent waives any and all claims that may have accrued against [Sylvania] with respect to the provision of a free appropriate public education for the period of May 2, 2016 through May 27, 2016." R. 28, PID 2398.

Thus, S.R. cannot claim that she did not "know or should have known about the alleged action that forms the basis of the [2016 ESY] complaint." § 1415(f)(3)(C).

be able to catch up during the following school year," *L.M.*, 478 F.3d at 314, even after S.R. stated that she would prevent C.K. from reading over spring break in attempt to show regression.

Accordingly, S.R. failed to show that ESY was necessary to permit C.K. to benefit from his instruction. *Id.* at 314.

**C. Whether S.R. is entitled to reimbursement for LMB programming during the pendency of judicial proceedings pursuant to the stay-put provisions of state and federal law**

Finally, S.R. argues that the district court erred by failing to address the SLRO's order that S.R. be reimbursed for LMB services provided during the pendency of the proceedings. S.R. correctly notes that, "[u]nder both federal and state law, during the pendency of judicial proceedings, a child must remain in the then current educational placement unless the parent and state educational agency otherwise agree." *Id.* (citing 20 U.S.C. § 1405(j); O.A.C. § 3301-51-05(K)(19)).

Both Ohio law and the implementing regulations of the IDEA contain provisions stating that a SLRO's determination may change a stay-put placement during the pendency of judicial proceedings because the SLRO's determination acts as an agreement between the state and the parents. 34 C.F.R. § 300.518(d); O.A.C. § 3301-51-05(K)(19)(a), (d). S.R. argues that because the SLRO agreed with the LMB placement during the pendency of proceedings and ordered that Sylvania reimburse S.R. for the cost of those services, "the interventions provided to C.K. by LMB during the pendency of judicial proceedings constitute C.K.'s current placement for purposes of stay put, entitling S.R. to reimbursement for expenses incurred from the date of issuance of the SLRO's decision regardless of her success on the merits of this appeal." Appellant's Br. at 52–53 (citation omitted); *see Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 453 (2d. Cir. 2015) ("Section 1415(j) represents Congress's policy choice that all handicapped children, *regardless of whether*

*their case is meritorious or not*, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved . . . the stay-put provision means that an educational agency is required to maintain the status quo placement even if the child would otherwise have no substantive right to it.") (internal citations omitted).

In response, Sylvania argues that the stay-put placement is the 2017–18 IEP and that the SLRO did not order private LMB programming as the new placement. Appellee's Br. at 49 ("While the SLRO ordered 'appropriate intensive reading programming' and mentioned LMB programming, the order did so without clarification regarding where the services were to be delivered and by whom . . . there [was] no change of placement because C.K. already receives direct instruction in reading decoding and an LMB-trained Sylvania employee could provide those services.")

Sylvania's interpretation is not convincing. Although the SLRO's order is not always clear, what is clear is that she found Sylvania's current reading placement inappropriate and ordered Sylvania to "provide C.K. with the LMB programming until such time that LMB testing supports a recommendation that C.K. no longer requires the intensive remedial reading interventions." R. 27, PID 2130; *see Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 372 (1985) (concluding that a state-officer decision favoring the parents' unilateral change of "placement would seem to constitute agreement by the State to the change of placement"). Thus, under both Ohio and federal law, the SLRO's order changed C.K.'s stay-put IEP to include intensive LMB services, entitling S.R. to reimbursement for the LMB services provided as a result of that change of placement.

Because the district court did not address this issue, we remand to the district court to determine the appropriate reimbursement and to issue an appropriate order.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, we AFFIRM and REMAND for further proceedings.